Robert SEIFFER et al., Plaintiffs,

v.

TOPSY'S INTERNATIONAL, INC., et al., Defendants.

BEAR, STEARNS & CO., et al., Defendants and Third-Party Plaintiffs,

v.

TOUCHE ROSS & CO. et al., Third-Party Defendants.

G. WALKER & COMPANY, Defendant and Third-Party Plaintiff,

v.

G. Kenneth BAUM et al., Third-Party Defendants.

BEAR, STEARNS & CO., et al., Defendants and Third-Party Plaintiffs,

v.

Jerome F. TEGELER et al., Third-Party Defendants.

BEAR, STEARNS & CO., et al., Defendants and Third-Party Plaintiffs,

v.

BRYAN, CAVE, McPHEETERS & McROBERTS, et al., Third-Party Defendants.

TOPSY'S INTERNATIONAL, INC., et al., Defendants and Third-Party Plaintiffs,

v.

BRYAN, CAVE, McPHEETERS & McROBERTS, et al., Third-Party Defendants.

Civ. A. No. KC–3435.

United States District Court, D. Kansas.

March 19, 1980.

Barton P. Cohen, Cohen & Cohen, Overland Park, Kan., Robert C. Gordon, Rich, Granoff & Gordon, Thomas W. Van Dyke, Linde, Thomson, Van Dyke, Fairchild & Langworthy, Sheridan Morgan, Donald H. Loudon, Kansas City, Mo., for all plaintiffs.

Charles S. Schnider, Schnider, Shamberg & May, Mission, Kan., Harry P. Thomson, Jr., William B. Prugh, Dennis Palmer, and Robert R. Raymond, Shughart, Thomson & Kilroy, Kansas City, Mo., for defendants Topsy's International, Inc., Jerry D. Berger, James T. House and Harry Nuell.

Martin J. Purcell, John R. Gibson and John R. Bancroft, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., Willard L. Phillips and John J. Jurcyk, Jr., McAnany, Van Cleave & Phillips, Kansas City, Kan., for defendants Bear, Stearns & Co., William Blair & Co., H. O. Peet & Co., Inc., First of Michigan Corp., Johnson, Lane, Space, Smith & Co., Inc.; Stephens, Inc., Stifel Nicolaus & Co., Inc., B. C. Christopher & Co., Piper, Jaffray & Hopwood, Inc. (successor to Ebin, Robertson & Co., Inc.), Hallowell, Sulzberger, Jenks & Co.; J. N. Russell, Inc., Hugh Johnson & Co., Inc., Mark Henry & Co., Zuckerman, Smith & Co., Kohlmeyer & Co., Scherck, Stein & Franc, Inc., Norris & Hirshberg, Inc.

Martin M. Green, Anderson, Green, Fortus & Lander, Clayton, Mo., for defendant I. M. Simon & Co.

Elsie K. DeVan, Corporate Secretary, for defendant Disbro & Co.

William H. Sanders and Edward Matheny, Jr., Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., Leonard O. Thomas, Weeks, Thomas, Lysaught, Bingham & Johnston, Kansas City, Kan., for defendant G. H. Walker & Co.

Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, Minn., N. Jack Brown, Boddington, Brown & Unverferth, Kansas City, Kan., for defendant Marvin L. Tucker, Adm. of the Estate of N. J. Sharlip, deceased, Ralph J. Tucker, George H. Charno, Jr., Sidney L. Willens, James P. Jouras and Marvin L. Tucker, d/b/a Tucker, Charno, Willens, Jouras & Tucker, a professional corporation.

William G. Levi and George W. Winger, Smith, Schwegler, Swartzman & Winger, Kansas City, Mo., Robert P. Anderson and Keith Martin, Payne & Jones, Olathe, Kan., Francis J. Higgins, Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., for defendant John D. Crouch, Thomas H. Devine, Jerry B. Jackson, Loren G. Hoffman, Carl Lipoff, Mary J. McCann, Rodney T. Minkin, Robert J. Petsche, Ben Ruben, and others, d/b/a Touche Ross & Co.

Frank Cicero, Jr. and Tefft W. Smith, Kirkland & Ellis, Chicago, Ill., Blake A. Williamson and Donald A. Hardy, Williamson, Cubbison & Hardy, Kansas City, Kan., for third-party defendant G. Kenneth Baum.

David R. Hardy, Gene E. Voigts, and Leo P. Dreyer, Shook, Hardy & Bacon, Kansas City, Mo., George A. Lowe, Olathe, Kan., for third-party defendants Robert H. McRoberts, Jr., Thomas S. McPheeters, Jr., William H. Charles, Arthur B. Shepley, Jr., Marion S. Francis, William C. Connett IV, Thomas V. Connelly, Veryl L. Riddle, Robert G. Brady, George S. Hecker, Robert H. McRoberts, Jr., William D. Crampton, Robert L. Sweney, John J. Goebel, William M. Van Cleave, Edwin S. Taylor, Jerome M. Rubenstein, Joseph F. Mueller, George V. Meisel, I. Jack Lerner, Harold G. Blatt, C. Perry Bascom, Paul P. Weil, Thomas C. Walsh, and Frederick W. Scherrer, d/b/a Bryan, Cave, McPheeters & McRoberts.

J. Willard Haynes, Kansas City, Kan., and John Calvert, Kansas City, Mo., for

third-party defendant Dempsey-Tegeler & Co., Inc.

Joseph J. Kelly, Jr., Spencer, Fane, Britt & Browne, Kansas City, Mo., and Ernest N. Yarnevich, Kansas City, Kan., for third-party defendants Jerome F. Tegeler, John C.

Hecht, Lewis J. Whitney, and Albert F. Gummersbach.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................... 658

II.  THE LAW AS TO THE CLAIMS OF PLAINTIFFS AND THE CLASS .. 661

   A.  Jurisdiction and Venue ...................................... 661

   B.  Touche, Ross & Co. as a Defendant ........................... 661

   C.  Right of Action Under Section 10(b) of the 1934 Act, Rule 10b–5 and Section 17(a) of the 1933 Act ............................... 661

   D.  The Elements of Plaintiffs' Cause of Action ..................... 662
      1.  Materiality ........................................ 663
      2.  The Degree of Fault Required ........................... 664
      3.  Causation ......................................... 665
      4.  Statute of Limitations .................................. 666

   E.  Accountants' Liability ...................................... 667

III. THE CLAIMED MISCONDUCT ................................. 669

   A.  Background ............................................... 669

   B.  The Purchase of SaxonS and Activities Through October 29, 1968 .... 670
      1.  The Acquisition of SaxonS .............................. 670
      2.  The "Audit" of SaxonS ................................. 671
      3.  The Operation of SaxonS as a Topsy's Subsidiary ............. 672
      4.  Kansas City Star Article, August 23, 1968 .................. 673
      5.  The 8–K Report, September 23, 1968 ....................... 674
      6.  Topsy's Letter to Shareholders, September 26, 1968 ........... 674
      7.  The Registration Statement and Preliminary Prospectus ....... 674
      8.  G. H. Walker Research Report, October 10, 1968 ............. 676
      9.  Kansas City Times Article, October 11, 1968 ................ 677

   C.  From the Filing of the Registration Statement Through the Closing of the Offering ................................................. 677
      1.  Topsy's 1968 Annual Report ............................. 677
      2.  Kansas City Times and Star Articles ...................... 678
      3.  Topsy's Letter to Shareholders, December 18, 1968 ........... 678
      4.  Kansas City Star and Times Articles ...................... 678
      5.  The Final Prospectus ................................... 679
         (a) The SaxonS Section of the Prospectus ................... 679
         (b) Audited SaxonS Financials and the "Use of Proceeds" Section ........................................ 687
         (c) The "Management and Principal Stockholders" Section of the Prospectus ...................................... 690
         (d) The "Transactions with Management" Section of the Prospectus ........................................ 691

   D.  From the Closing of the Offering Through August 1, 1969 ........ 691
      1.  Kansas City Star Article, February 23, 1969 ............... 693
      2.  Quarterly Report to Shareholders, March 19, 1969 .......... 693
      3.  Kansas City Times Article, March 20, 1969 ................ 693
      4.  G. H. Walker Research Notes, April 11, 1969 ............... 693

5. Quarterly Report to Shareholders, June 20, 1969 ............. 694
6. The New Franchise Agreement .......................... 694
7. The Poulos Transactions .............................. 695
8. The Gottleib Transaction ............................. 695

E. After August 1, 1969 ..................................... 695
1. The Settlement with West ............................. 695
2. Repurchase of the Debentures .......................... 695
3. Securing Advances to SaxonS .......................... 696
4. The 1969 Audit and Annual Report ...................... 696
5. Quarterly Report to Shareholders, November 28, 1969 ........ 698
6. Annual Meeting of Shareholders ......................... 698
7. Quarterly Report to Shareholders, March 6, 1970 ........... 699
8. The Feibleman Settlement ............................. 700
9. Quarterly Report to Shareholders, June 24, 1970 ............ 701
10. Topsy's 1970 Annual Report ........................... 702

IV. DECISION AND DISPOSITION ............................... 702

A. Statute of Limitations ................................... 702

B. The Merits ........................................... 706

C. The Cross-Claims ...................................... 708
1. Topsy's Cross-Claim for Indemnity Against Touche Ross ....... 708
2. G. Kenneth Baum's Claim Against Topsy's ................. 709

V. FINALE .............................................. 709

## I. INTRODUCTION.

This action was brought by a number of purchasers of common stock and convertible subordinated debentures issued by Topsy's International, Inc. Plaintiffs have alleged that defendants violated Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)],[1] Section 10 of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)],[2] Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5],[3] and the Kansas Blue Sky Law [K.S.A. 17-1268] in that they participated in a scheme to create an active and rising market in Topsy's stock up to the

1. 15 U.S.C. § 77q(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

2. 15 U.S.C. § 78j. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— . . .
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

3. 17 C.F.R. § 240.10b-5. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

date of the public offering of stock and debentures, by means of statements which contained misrepresentations or were misleading because they omitted material facts. Plaintiffs have further alleged that thereafter defendants concealed the misstatements and omissions to maintain a market price for Topsy's securities above that which would have prevailed if accurate information had been disclosed.

The alleged misrepresentations and omissions center on SaxonS, an Ohio corporation in the business of franchising roast beef sandwich shops, purchased by Topsy's in the summer of 1968. On February 4, 1969, Topsy's made a public offering of $6,000,-000.00 5¾% convertible subordinated debentures due February 1, 1984, and 104,796 shares of Class A Common Stock owned by three Topsy's officers—Jerry D. Berger, James T. House, and Harry Nuell. The final prospectus for the offering stated that the net proceeds from the sale of debentures would be used "to finance the acquisition, construction and development of sites for SaxonS Sandwich ShoppeS." Information disseminated to the public was generally favorable until March 6, 1970, when a letter from Topsy's to its shareholders reported that Topsy's had repurchased three SaxonS franchised units, which resulted in a reduction in second quarter earnings in the amount of $292,000.00. In a letter to shareholders of June 24, 1970, Topsy's reported that it was discontinuing its SaxonS operations.

The case was certified as a class action by an order of June 27, 1974. *Seiffer v. Topsy's International, Inc.*, 64 F.R.D. 714 (D.Kan.1974), *app. dismissed* 520 F.2d 795 (10th Cir. 1975), *cert. denied* 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976). The class was defined as consisting of purchasers of the Common Stock of Topsy's from September 28, 1968 to March 10, 1970, and purchasers of the debentures from February 4, 1969 to March 10, 1970. These dates coincide roughly with when shareholders would have received letters from Topsy's management announcing the acquisition of SaxonS and reporting the losses from the repurchase of SaxonS units.

On September 30, 1968, the bid prices of Topsy's Class A Common Stock ranged between a high of 36¾ and a low of 35; the asked prices ranged between a high of 37¼ and a low of 35¾. On October 18, 1968, Topsy's declared a 100% stock dividend. The effect was to double the number of shares outstanding while cutting in half the market price of the shares. On October 22, 1968, prior to reflection of the dividend, the bid prices of the stock ranged between a high of 41 and a low of 39¾; the asked prices ranged between a high of 42 and a low of 40¾. After reflection of the dividend on that day, the bid prices ranged between a high of 20¾ and a low of 20½; the asked price was 21½. On February 4, 1969, the bid prices ranged between 28 and 26¾; the asked prices ranged between 29 and 27½. From that date date prices moved rather steadily downward. On March 10, 1970, the bid prices ranged between a high of 5 and a low of 3⅞; the asked prices ranged between 5½ and 4¼.

The original complaint in this action was filed November 11, 1971, by Robert Seiffer, Leah Seiffer, Marshall Gordon, Herman Horowitz, Stephen Horowitz, and Hefjos, Inc. on behalf of themselves and all other holders of stock and debentures against Topsy's, Jerry D. Berger, James T. House, and Harry Nuell. Berger is, and was in 1968–1970, the founder of Topsy's, its chairman of the board, chief executive officer, and chief financial officer. In the 1969 offering he sold 80,226 shares of Class A Common Stock and realized net proceeds of approximately $2,089,054.04. House was, at all relevant times, president and a director of Topsy's. In the 1969 offering he sold 20,000 shares of Class A Common Stock realizing net proceeds of approximately $520,800.00. Nuell was secretary-treasurer and a director of Topsy's. In the 1969 offering he sold 4,570 shares of stock (all that he owned at that date), realizing approximately $119,002.80 in net proceeds. The complaint alleged violations of Sections 5, 11, 12(2), and 17(a) of the 1933 Act, Section 10(b) of the 1934 Act, Rule 10b–5, and Kansas securities laws.

The First Amended Complaint was filed January 31, 1972. Mark T. Anthony and Joseph and Rea Fried were added as named plaintiffs. All of the underwriters of the 1969 offering, except Dempsey-Tegeler & Co., Inc., were added as defendants.

The Second Amended Complaint was filed on October 24, 1972. While the parties remained the same, the alleged violations were narrowed somewhat to Section 17(a) of the 1933 Act, Section 10(b) of the 1934 Act, Rule 10b–5, and K.S.A. 17–1268. The underwriters then cross-claimed against Topsy's, Berger, House, and Nuell and filed third-party complaints against Tucker, Charno, Willens, Jouras & Tucker, G. Kenneth Baum, and Touche, Ross & Co.

Tucker Charno was counsel for Topsy's, Berger, House, and Nuell in the 1969 offering. Its five attorneys worked in an office-sharing arrangement until they formed a partnership on January 1, 1969. G. Kenneth Baum was a director of Topsy's. Touche, Ross, a partnership, had performed auditing services for Topsy's from 1967, when it merged with the Kansas City accounting firm of Lipoff, Sharlip & Pesman, until 1973.

One of the underwriters, G. H. Walker & Co., undertook a separate defense and also filed a cross-claim against Topsy's, Berger, House, and Nuell, and third-party complaints against Tucker Charno, Baum, and Touche, Ross. G. H. Walker was subsequently acquired by White, Weld & Co., which was substituted as a party defendant.

Topsy's, Berger, House, and Nuell cross claimed against the underwriters and filed third-party complaints against Tucker Charno and Touche Ross.

On October 10, 1973, plaintiffs filed a Third Amended Complaint adding Tucker Charno and John D. Crouch, Thomas H. Devine, Jerry .B. Jackson, Loren G. Hoffman, Carl Lipoff, Mary McCann, Rodney T. Minkin, Robert J. Petsche, and Ben Ruben, *et al.*, d/b/a Rouche Ross & Co., as defendants. The third-party complaints against these newly-added defendants were then reasserted as cross-claims.

Tucker Charno and Touche Ross then filed cross-claims against the other defendants and each other. Tucker Charno also filed a third-party complaint against Baum.

On July 22, 1974, the underwriters filed third-party complaints against Bryan, Cave, McPheeters & McRoberts (underwriters' counsel in the 1969 offering) and Jerome F. Tegeler, John C. Hecht, Albert Gummersbach, and Lewis J. Whitney (alleged to be control persons of Dempsey-Tegeler & Co., Inc., the lead underwriters). Topsy's, Berger, House, and Nuell filed third-party complaints against Bryan Cave and the above-named control persons of Dempsey-Tegeler and Dempsey-Tegeler & Co. The third-party complaint against Dempsey-Tegeler & Co. was dismissed by the court; the others were subsequently voluntarily dismissed by the underwriters, Topsy's, Berger, House, and Nuell.

Plaintiffs sought leave to file a Fourth Amended Complaint which would have added Bryan Cave and the Dempsey-Tegeler control persons. Leave, however, was denied.

In March 1976, plaintiffs and the class settled with Topsy's, Berger, House, Nuell, and most of the underwriters. Topsy's paid $1,000,000.00; Berger, House and Nuell paid $225,000.00. The settlement with the underwriters was $194,100.00, including $16,500.00 paid by G. Kenneth Baum.[4]

4.

| Underwriter | Settlement Payment |
|---|---|
| Bear Stearns & Co. .............. | $ 13,750.00 |
| White Weld & Co., Inc., Successor to G. H. Walker & Co. ......... | 72,000.00 |
| William Blair & Company ........ | 8,250.00 |
| H. O. Peet & Co. ............... | 8,250.00 |
| First of Michigan Corporation .... | 6,270.00 |
| Johnson, Lane, Space, Smith & Co., Inc. ......................... | 6,270.00 |

| Underwriter | Settlement Payment |
|---|---|
| Kohlmeyer & Company In Liquidation ........................ | 6,270.00 |
| Scherck, Stein & Franc, Inc. ...... | 6,270.00 |
| Stephens, Inc. ................... | 6,270.00 |
| Stifel, Nicolaus & Company, Incorporated ................... | 6,270.00 |
| B. C. Christopher & Co. .......... | 5,500.00 |

Baum had not been sued by the plaintiffs but was named as a third-party defendant by the underwriters. This settlement disposed of their claims against him. In July 1977, a settlement of $8,250.00 between plaintiffs and the class and underwriter Lester, Ryons & Co. was approved by the court.

In September 1978, the court approved a settlement of $1,100,000.00 and all court costs to date, between plaintiffs and the class and Tucker Charno.

The cross-claims between Topsy's, Berger, House, Nuell, the underwriters, White Weld, and Tucker Charno were dismissed on stipulation of these parties. Thus, plaintiffs' claims against Touche Ross and cross-claims between Touche Ross and Topsy's, Berger, House, Nuell, the underwriters, White Weld, and Tucker Charno remain for determination. Trial to the court began January 15, 1979, and continued to April 11, 1979. On May 8, 1979, Baum filed a cross-claim for indemnity against Topsy's.

Post-trial briefs and suggested findings and conclusions were filed on August 15, 1979, and reply memoranda were filed on September 17, 1979. Since that time, the court has engaged in the painstaking process of reviewing, sifting, and analyzing the great mass of testimony, evidence, and argument submitted for its consideration in determining the difficult questions presented by this case. The court is now prepared to render its decision. Before doing so, however, the court wishes to gratefully acknowledge the diligence, industry, and cooperation of counsel for all parties. The high quality of advocacy during the trial, and especially in the post-trial briefs, has aided the court immeasurably.

## II. THE LAW AS TO THE CLAIMS OF PLAINTIFFS AND THE CLASS.

A. *Jurisdiction and Venue.* Jurisdiction and venue in this action are based upon Section 22(a) of the Securities Act of 1933 [15 U.S.C. § 77v(a)] and Section 27 of the Securities Exchange Act of 1934 [15 U.S.C. § 78aa]. As the court indicated in its order of October 2, 1972, this court has subject matter jurisdiction and venue is proper in this district.

■ B. *Touche Ross & Co. as a Defendant.* Touche Ross has argued that it has never been sued by the plaintiffs and is not a defendant in this action. Touche Ross is a partnership and agrees that it may be sued under its common name. Federal Rule of Civil Procedure 17(b). The Third Amended Complaint, however, named certain Touche Ross partners "d/b/a Touche, Ross & Co." Touche Ross has long participated in this action under its common name, frequently referring to itself as "Defendant Touche Ross." *See, e. g.* Document 1121. This participation leads us to assume that it had adequate notice that whatever form plaintiffs initially used, the suit was against the partnership. We have found no cases considering this question, but because we believe that Touche Ross partnership has not been prejudiced by plaintiffs' initial disregard of the common name, we hold that Touche, Ross & Co. is properly a defendant here.

■ C. *Right of Action Under Section 10(b) of the 1934 Act, Rule 10b–5, and Section 17(a) of the 1933 Act.* Touche Ross vigorously contends that plaintiffs have no private right of action under Section 10(b) and Rule 10b–5. Section 10(b) of the 1934 Act does not, of course, by its terms provide an express civil right of action and the history of the section does not show any sign that Congress considered the problem of private suits. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 729, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1975). Similarly Rule 10b–5 makes no expression of a pri-

| Underwriter | Settlement Payment | Underwriter | Settlement Payment |
|---|---|---|---|
| Piper, Jaffray & Hopwood, Incorporated, Successor to Ebin, Robertson & Co., Inc. | 5,500.00 | I. M. Simon & Co. | 5,500.00 |
| Hallowell, Sulzberger, Jenks & Co. | 5,500.00 | Hugh Johnson & Company, Inc. | 3,410.00 |
| Norris & Hirshberg, Inc. | 5,500.00 | Mark Henry & Co. | 3,410.00 |
| | | Zuckerman, Smith & Co. | 3,410.00 |
| | | TOTAL | $177,600.00 |

vate right of action. In 1946 it was held that a private right existed under the Rule, *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa.1946), and in 1971 the Supreme Court confirmed without discussion that such a cause of action existed. *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n.9, 92 S.Ct. 165, 169 n.9, 30 L.Ed.2d 128 (1971). While, in recent years there has been a trend toward limiting the scope of the private cause of action and increasing judicial concern with the vexation of litigation, the Supreme Court has continued to operate on the assumption that a private right exists. *See, e. g. Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps, supra*. We hold that a private right of action under Section 10(b) and Rule 10b–5 exists in the circumstances of this case.

We considered the question of whether a private right of action exists under Section 17(a) of the 1933 Act in our order of November 8, 1978. We have taken the position that because Section 17(a) is virtually identical to Rule 10b–5, there is little practical point in denying the right to maintain a private action. The conduct prohibited by Section 17(a) does not seem to vary in any significant respect from that prohibited by Rule 10b–5. R. Jennings, & H. Marsh, Securities Regulation 864 (1977). While Rule 10b–5 relates only to sales and Section 17(a) to offers or sales, in the circumstances of this case the difference is irrelevant.

■ Touche Ross argues further that plaintiffs have no right of action under Section 10(b), Rule 10b–5, and Section 17(a) because Section 18 of the 1934 Act provides the exclusive remedy for misleading documents filed with the SEC. In our order of November 8, 1979, we concluded that the remedies afforded by Section 10(b), as well as other sections of the 1934 Act, are cumulative and not mutually exclusive. While we did not discuss *Touche, Ross & Co. v. Reddington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) in our earlier order, we do not believe it requires a different result. The Court in *Reddington* held that a pri-

vate cause of action could not be implied from Section 17(a) of the 1934 Act [15 U.S.C. § 78q(a)], which requires broker-dealers and others to keep such records and file such reports as the Securities Exchange Commission may prescribe. Using the *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) test, the Supreme Court concluded that there was "no basis in the language of § 17(a) for inferring that a civil cause of action for damages lay in favor of anyone." *Reddington, supra*, 442 U.S. at 571, 99 S.Ct. at 2486. In what is essentially dictum, the Court went on to consider Section 18(a) of the 1934 Act, which does create a cause of action against persons who make or cause to be made materially misleading statements in reports or other documents filed with the Commission, including reports filed pursuant to Section 17(a). Section 18(a) was not available to the *Reddington* plaintiffs because the section grants the right of action only to purchasers or sellers who rely on such misrepresentations. Although the Court noted that "[t]here is evidence to support the view that § 18(a) was intended to provide the exclusive remedy for misstatements contained in any reports filed with the Commission," *Reddington, supra* at 573, 99 S.Ct. at 2488, it did not consider the overlap of sections of the 1934 Act, for example Section 10(b), which have long been held to provide implied causes of action. We do not believe that the Court intended its passing observation on Section 18(a) to indicate that Section 18(a) must now preclude actions under Section 10(b) when such law suits involve allegations of misleading statements in documents filed with the Commission.

■ D. *The Elements of Plaintiffs' Cause of Action.* In order to make out a private cause of action, plaintiffs must prove certain elements. The violations must be in connection with the purchase or sale of securities. *Blue Chip Stamps, supra*. The misrepresentations or omissions must be material. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). A defendant must have acted with some form of

scienter beyond mere negligence. *Ernst & Ernst, supra*, 425 U.S. at 193, 96 S.Ct. at 380. There must be a causal relationship between the claimed violations and the injuries suffered by plaintiffs. *Affiliated Ute, supra*, 406 U.S. at 154, 92 S.Ct. at 1472.

The "in connection with" element has clearly been shown in this case and need not be discussed. The other elements warrant further comment.

1. *Materiality.* Materiality is an element of common law fraud that is required by the express language of Rule 10b–5(2) and by interpretation of subsections (1) and (3). The concept of materiality is basically an objective one. 3 A. Bromberg, Securities Law: Fraud § 8.3 at 201 (1977). The test for materiality has been articulated in a variety of phrases. In a 1970 case involving alleged violation of Section 14(a) of the 1934 Act and Rule 14a–9 thereunder (misleading statements in proxy statements), the Supreme Court held that the determination of materiality "indubitably embodies a conclusion that the defect was of such a character that it *might* have been considered important by a reasonable shareholder who was in the process of deciding how to vote." *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970) (emphasis added).

In *Mitchell v. Texas Gulf Sulfur Co.*, 446 F.2d 90 (10th Cir. 1971), *cert. denied* 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971), *rehearing denied* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972), a 10b–5 case, the court held that "[m]isrepresented or omitted facts become material, hence actionable under 10b–5, when, considering the complaining parties as reasonable investors, the disclosure of the undisclosed facts or candid revelation of misleading facts *would* affect their trading judgment. . . . The implicit variables to be weighed in a materiality analysis are the magnitude and probability of the occurrence of the event, set against the size and total activity of the subject company." *Mitchell, supra* at 97 (emphasis added).

In 1972, the Supreme Court, in a 10b–5 case, again employed the "might" language

of *Mills*: "Under the circumstances of this case, involving primarily a failure to disclose, positive *proof* of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor *might* have considered them important in the making of this decision." *Affiliated Ute, supra*, 406 U.S. at 153–54, 92 S.Ct. at 1472 (emphasis added).

What commentators have called the great "would-might" debate appears to have been resolved by the Supreme Court in *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). R. Jennings & H. Marsh, *supra* at 931–32. The *TSC* case concerned alleged violations of Rule 14a–9 and the Court stated the general standard of materiality as follows:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills* general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *TSC, supra* at 449, 96 S.Ct. at 2132.

■ The standard of *TSC* may be adapted to the circumstances of this case and as such will be used as the standard of materiality here. An omitted or misstated fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to purchase securities—that is, it would have assumed

actual significance in his deliberation, or it would have been viewed by him as having significantly altered the total mix of information made available.

2. *The Degree of Fault Required.* In considering this problem we have found helpful Professor Ruder's approach, which defines conduct in descending order of degree of culpability:

1. Deliberate conduct exists when the defendant has an intent to injure others.

2. Knowing conduct exists when the defendant acts with the knowledge that his acts may injure others. Knowing conduct would include knowing misrepresentation or nondisclosure.

3. Reckless conduct exists when the defendant acts in conscious disregard of, or indifference to, the risk that others will be misled. This conduct includes what is sometimes referred to as "gross negligence."

4. Negligent conduct exists when the defendant acts unreasonably but does not act with conscious disregard of consequences.

5. Innocent conduct exists when the defendant cannot reasonably be expected to know the true facts.

Ruder & Cross, *Limitations on Civil Liability Under Rule 10b–5,* 1972 Duke L.J. 1125 (1972).

In 1976, the Supreme Court held that a private cause of action will not "lie under § 10(b) and Rule 10b–5 in the absence of any allegation of 'scienter'—intent to deceive, manipulate, or defraud." *Ernst & Ernst, supra,* 425 U.S. at 193, 96 S.Ct. at 1381. While the Court drew the culpability line above negligence, it did not specify precisely where it should be based. Rather, the Court stated that "[i]n this opinion the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5." *Id.* at 193–94 n.12, 96 S.Ct. at 1381 n.12.

The Tenth Circuit has not addressed directly the question in the context of a private suit for damages. In *Edward J. Mawod & Co. v. SEC,* 591 F.2d 588 (10th Cir. 1979), an appeal from a SEC enforcement action, the court held that in such cases reckless behavior satisfies the scienter requirement. In 1977, the Tenth Circuit stated that "[w]illful or intentional misconduct, *or the equivalent thereof,* is essential to recovery" under Section 10(b) or Rule 10b–5. *Utah State University v. Bear, Stearns & Co.,* 549 F.2d 164, 169 (10th Cir. 1977) (emphasis added). In this District, Judge Rogers has taken the "or the equivalent thereof" language to mean that recklessness is sufficient. *In re Clinton Oil Securities Litigation,* [77–78 Transfer Binder] CCH Sec.L.Rptr. ¶ 96,015 (D.Kan. 3/18/77). The courts of appeal that have considered the question have agreed that recklessness is enough to satisfy the scienter requirement. *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38 (2nd Cir. 1978), *cert. denied* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Coleco Industries, Inc. v. Berman,* 567 F.2d 569 (3rd Cir. 1977), *cert. denied* 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978); *First Virginia Bankshares v. Benson,* 559 F.2d 1307 (5th Cir. 1977), *cert. denied* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir. 1977), *cert. denied* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Nelson v. Serwold,* 576 F.2d 1332 (9th Cir. 1978), *cert. denied* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

In *McLean v. Alexander,* 599 F.2d 1190 (3rd Cir. 1979), recklessness was considered in the context of accountants' liability. We find the *McLean* court's analysis particularly appropriate and adopt it here:

In *Sundstrand Corp. v. Sun Chemical Corp., supra,* the Seventh Circuit stated the minimum threshold for liability under § 10(b) as follows:

"[R]eckless conduct may be defined as . . . highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

In context, the *Sundstrand* formula was applied only to omissions, but the standard of liability proposed there is, we think, equally applicable to misstatements, and we approve it in both contexts. *Accord, Rolf v. Blyth, Eastman Dillon & Co., supra,* 570 F.2d at 47.

The *Sundstrand* formulation of recklessness makes it clear, as did *Hochfelder,* that negligence—whether gross, grave or inexcusable—cannot serve as substitute for scienter. At the same time, as applied to the somewhat specialized area of accountants' liability, that standard preserves a federal right of action for the kind of accountants' fraud that has been generally recognized as actionable at common law since the leading case of *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931). Judge Cardozo's opinion in *Ultramares* would have permitted recovery for fraud upon a showing that a misrepresentation was made knowingly or wilfully, or with reckless disregard for its truth or falsity, or without a "genuine belief" in its truth. Further, fraud "includes the pretense of knowledge when knowledge there is none." As Judge Swan made clear in *O'Connor v. Ludlam,* 92 F.2d 50, 54 (2d Cir. 1937), also an accountants' liability case, in an action for fraud under the *Ultramares* standard:

the issue [is] whether the defendants had an honest belief that the statements made by them were true. "If they did have that honest belief, whether reasonably or unreasonably, they are not liable. If they did not have an honest belief in the truth of their statements, then they are liable, so far as [scienter] is concerned."

It seems to us that the purpose of footnote 12 of the *Hochfelder* opinion was to preserve, at least in the context of accountants' liability, the standards of scienter developed in *Ultramares* and *O'Connor v. Ludlam.* And the core requirement of those cases is that the plaintiff establish that the defendant lacked a genuine belief that the information disclosed was accurate and complete in all material respects. *Accord, Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d at 1045 n.20.

We stress that to prove scienter the plaintiff need not produce direct evidence of the defendant's state of mind. Circumstantial evidence may often be the principal, if not the only, means of proving bad faith. A showing of shoddy accounting practices amounting at best to a "pretended audit," or of grounds supporting a representation "so flimsy as to lead to the conclusion that there was no genuine belief back of it" have traditionally supported a finding of liability in the face of repeated assertions of good faith, and continue to do so. In such cases, the factfinder may justifiably conclude that despite those assertions the "danger of misleading . . . [was] so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chemical Corp., supra,* 553 F.2d at 1045. *McLean, supra* at 1197–98.

We hold that recklessness as explained by the *McLean* court will satisfy the scienter requirement of *Ernst & Ernst.*

3. *Causation.* As we indicated above, there must be a causal connection between the claimed violations of Section 10(b) and Rule 10b–5 and the injuries suffered by plaintiffs. *Affiliated Ute, supra,* 406 U.S. at 154, 92 S.Ct. at 1472. We believe the problem of causation in the circumstances of this case can best be understood in terms of two components: transaction causation and loss causation. With respect to the first, our concern is that there was a causal relationship between the alleged misrepresentations and omissions and the purchases by plaintiffs and the class of Topsy's securities and debentures. In common law fraud

cases this relationship is insured by the requirement that a plaintiff prove that he justifiably relied on a defendant's misrepresentations. *See, e. g.* Restatement (Second) of Torts § 525 (1977).

In the context of private actions under the federal securities laws, there has been a steady trend away from requiring proof of reliance to establish transaction causation. In *Mills v. Electric Auto-Lite*, a proxy case, the Supreme Court stated "[w]here the misstatement or omission in a proxy statement has been shown to be 'material,' . . . that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a *significant propensity* to affect the voting process is found in the express terms of Rule 14a-9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by Section 14(a)." *Mills, supra*, 396 U.S. at 384, 90 S.Ct. at 621. The Supreme Court used this approach in *Affiliated Ute, supra*, 406 U.S. at 153–54, 92 S.Ct. at 1472, a 10b–5 case. As we indicated in *Seiffer*, 63 F.R.D. at 718, and our order of November 8, 1978, we regard *Affiliated Ute* as controlling. As the Second Circuit noted in *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 238 (2nd Cir. 1975), "[t]he parallel elements of materiality and reliance both serve to restrict the potentially limitless thrust of Rule 10b–5 to those situations in which there exists a causation in fact between the act and the injury." When it is, as a practical matter, impossible to demonstrate reliance, resort must be had to materiality. It seems particularly appropriate to focus on materiality in a case such as the one before us, which involves communications which allegedly contained misrepresentations and failed to disclose material facts, and which were disseminated to thousands of investors. *See Mills, supra*, 396

U.S. at 380, 90 S.Ct. at 619, citing with approval the Seventh Circuit's conclusion that "[r]eliance by thousands of individuals, as here, can scarcely be inquired into."

■ We do not believe, however, that these cases mean that reliance is absolutely irrelevant in this case. Rather, we are in accord with Professor Ruder's conclusion that a finding of materiality gives rise to a presumption of reliance which may be rebutted. Ruder & Cross, *supra* at 1137–38. *See also Rifkin v. Crow*, 574 F.2d 256 (5th Cir. 1978). Thus, defendant Touche Ross was afforded the opportunity to present proof that the presumption of reliance was incorrect.

With respect to loss causation, the securities transactions, assuming that they were caused by material misstatements and omissions, must be shown to have resulted in the injury for which plaintiffs wish to be compensated. In our order of January 4, 1979, we held that there is a presumption in plaintiffs' favor that a loss shown by a decline in market price between the time of purchase and the time of discovery is attributable to the alleged fraud. The presumption is rebuttable and defendants were given the opportunity to prove that the decline was attributable to factors apart from the misrepresentations and omissions.

■ 4. *Statute of Limitations.* As we have held in earlier orders, the Kansas statute of limitations for fraud [K.S.A. 60–513(a)(3)] and the federal tolling doctrines are applicable in this case. *Seiffer*, 63 F.R.D. at 716; Memorandum and Order, November 8, 1978. We relied on *Esplin v. Hirschi*, 402 F.2d 94 (10th Cir. 1968), which in turn relied on *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946). The *Holmberg* court expressed the doctrine as follows:

If want of due diligence by the plaintiff may make it unfair to pursue the defendant, fraudulent conduct on the part of the defendant may have prevented the plaintiff from being diligent and may make it unfair to bar appeal to equity because of mere lapse of time.

Equity will not lend itself to such fraud and historically has relieved from it. It bars a defendant from setting up such a fraudulent defense, as it interposes against other forms of fraud. And so this Court long ago adopted as its own the old chancery rule that where a plaintiff has been injured by fraud and "remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." *Id.* at 396–97, 66 S.Ct. at 584–585 (citations omitted).

We are in accord with Professor Ruder's interpretation of the doctrine "that where a person has been injured by fraud, his lack of diligence in pursuing his rights, which normally would bar his claim, will be excused by a defendant's fraudulent concealment. This standard implies further that a plaintiff can assert the tolling doctrine even in the absence of defendant's concealment if the plaintiff is diligent in his efforts to discover the fraud." Ruder & Cross, *supra* at 1143. We understand that to mean that our concern must be with when, in light of the allegations of a defendant's fraudulent concealment, a plaintiff should have discovered the fraud. The statute of limitations begins to run at that point.

In our earlier order we indicated that in this case an objective standard of due diligence should be applied. *Seiffer*, 63 F.R.D. at 719. Thus, we must determine when, in light of the allegations of fraudulent concealment, a reasonable investor should have discovered the fraud. At issue is whether plaintiffs' claim against Touche Ross, which was filed on October 10, 1973, is time barred. Our inquiry must therefore be whether a reasonable investor should have discovered the alleged fraud of Touche Ross before October 10, 1971.

E. *Accountants' Liability.* Commonly, in securities fraud actions, a distinction has been drawn between primary and secondary

defendants. Those persons or entities owing direct duties to the public are classified as primary wrongdoers and those whose liabilities arise because another has violated the law are classified as secondary wrongdoers. Ruder, *Multiple Defendants In Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution*, 120 U.Pa. L.Rev. 597, 600 (1972).

Accountants may be primary wrongdoers when they themselves make statements to investors which contain misrepresentations or omit to state facts necessary to make what is said not misleading. Financial statements certified by an accountant for presentation to investors give rise to a direct duty to the public. The accountant was in the position of a primary violator in *McLean v. Alexander*, 599 F.2d 1190 (3rd Cir. 1979), where a Certified Report of Examination, containing an audited balance sheet, was alleged to include a false statement. The scienter standard we discussed above was applied and the Third Circuit stated that because the opinion was based upon generally accepted auditing standards, the accountant "could be held to have the necessary scienter only if the evidence supports an inference that when it expressed the opinion it had no genuine belief that it had the information on which it could predicate that opinion." *Id.* at 1198. The court, in reversing the trial court, held that the investigation the accountant made and the knowledge it had could not give rise to an inference that it must have been aware of the risk that the item at issue was misleading. *Id.* at 1199.

Accountants may also be charged as aiders and abettors. The leading case dealing with aiding and abetting is *Brennan v. Midwestern United Life Insurance Co.*, 259 F.Supp. 673 (N.D.Ind.1966) (motion to dismiss denied), 286 F.Supp. 702 (N.D.Ind. 1968) (on merits), *aff'd* 417 F.2d 147 (7th Cir. 1969), *cert denied*, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). Primary defendants were found to have violated the securities laws by fraudulently accepting orders for stock of Midwestern Life and

using the payments to speculate in the commodities market. Liability was imposed on Midwestern on the ground that it knew the primary defendants were violating the securities laws and had actively aided and abetted them.

While the elements of an aiding and abetting claim have not yet completely crystalized, we believe that the analysis in *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975) is particularly enlightening. The *Woodward* court relied on the definition in *SEC v. Coffey*, 493 F.2d 1304 (6th Cir. 1974), *cert. denied* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975): "[A] person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had a general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." 493 F.2d at 1316. The *Woodward* court rejected the definition in *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139 (3rd Cir. 1973), *cert. denied* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), which referred to an "independent wrong" instead of securities law violation and to "knowledge of the wrong's existence" instead of the aider-abettor's awareness of his role in the improper activity. *Landy* omitted the "knowing" requirement of the substantial assistance element. The court in *Woodward* reasoned as follows:

> The first two *Landy* elements pose a danger of over-inclusiveness and seem to lose sight of the necessary connection to the securities laws. One could know of the existence of a "wrong" without being aware of his role in the scheme, and it is the participation that is at issue. The scienter requirement scales upward when activity is more remote; therefore, the assistance rendered should be both substantial and knowing. A remote party must not only be aware of his role, but he should also know when and to what [extent] he is furthering the fraud. *Woodward, supra* at 95.

We believe that the knowledge requirements of this definition—knowledge of securities law violation, knowledge of one's role in the fraud, and knowing assistance—as opposed to a recklessness or "should have known" standard are crucial for the reasons well-stated by Professor Ruder:

> In most cases, the alleged aider and abettor (or conspirator) will merely be engaging in customary business activities, such as loaning money, managing a corporation, preparing financial statements, distributing press releases, completing broker's transactions, or giving legal advice. If each of these parties will be required to investigate the ultimate activities of the party whom he is assisting, a burden may be imposed upon business activities that is too great. Although such a duty might contribute to the protection of investors by creating another level of private investigators, creation of such a duty through the use of aiding and abetting or conspiracy concepts should take place only through the sound foundation of judicial precedent in analogous fields or express statutory language. Ruder, *supra* at 632–33.

A "remote" party is further protected somewhat by the requirement that an aider-abettor's assistance be "substantial," which reflects the concern of courts with causation. In considering this, the district court in *Brennan, supra*, 286 F.Supp. at 725, turned to the common law roots of liability under the securities laws and noted that an "[asserted] part of the common law of torts has always been the limitation that a tortfeasor is not liable for a loss unless his tortious conduct was a substantial factor in bringing the loss about." The problem is determining what losses, if any, the aider-abettor "conduct was *in fact* a substantial factor in bringing about." *Id.*

We believe that in order to establish aiding and abetting liability, plaintiff must prove that there were securities laws violations, that Touche Ross knew of the violations and of its role in the scheme, and, with this knowledge, substantially assisted in the violation. In light of this

standard the question of an accountant's adherence to generally accepted auditing standards and generally accepted accounting principles is of limited importance. An accountant, who knows that by complying with these standards and principles he is substantially assisting in a fraud, is not protected. On the other hand, an accountant, who relies on the profession's standards and principles without knowledge that by doing so he is playing a role in furthering a fraud, will not be held liable.

## III. THE CLAIMED MISCONDUCT.

A. *Background.* Topsy's International, Inc. was the outgrowth of a popcorn shop located in the Country Club Plaza, Kansas City, Missouri, which was established by Jerry Berger in 1949. Prior to the summer of 1968, Topsy's operated snack bars in discount department stores or enclosed mall shopping centers, popcorn concessions in variety and discount department stores, in-plant feeding, franchised Topsy's Popcorn & Ice Cream Shops subleased to others, and mobile units selling popcorn, soft drinks, and other items in discount department stores. The franchising operation of popcorn and ice cream shops began in 1967. In December 1967, Topsy's made a public offering of 210,000 shares of Class A Common Stock at $19.00 per share. Topsy's stock was (and continues to be) sold in the over-the-counter market. Topsy's itself sold 48,343 shares; Berger sold 115,000 shares; House sold 24,000 shares; and Nuell sold 10,500 shares. Counsel for the offering was Tucker Charno, and Ralph Tucker sold 10,500 shares of his own. The accounting firm for the offering was Touche, Ross, Bailey & Smart. Dempsey-Tegeler & Co. acted as the lead underwriter.

Prior to 1966, Topsy's had been audited by a small local accounting firm. In 1966, the accounting firm of Lipoff, Sharlip and Pesman audited the consolidated financial statements of Topsy's. Berger had met Nat Sharlip in 1960 through Ralph Tucker. They had a social as well as a business relationship. House had met Sharlip sometime between 1946 and 1950, and also had a social relationship with him. In 1967, the Lipoff, Sharlip and Pesman firm merged with Touche Ross. Sharlip became a Touche Ross partner as a result of the merger and was partner in charge of Topsy's 1967 audit engagement. Touche Ross, through Sharlip, performed additional business advisory services for Topsy's, and Sharlip frequently attended board meetings through 1970.

Topsy's, of course, reported to its shareholders on a quarterly and annual basis. Touche Ross audited the consolidated financial statements that were included in the 1968, 1969, and 1970 annual reports. The other parts of the annual reports were prepared by Topsy's management with the assistance of Ralph Tucker, and were not reviewed by Touche Ross prior to distribution. Similarly, the quarterly reports, which did not contain audited financials, were prepared by management and not reviewed by Touche Ross before release.

Jack Halper, an employee of Dempsey-Tegeler, became a member of Topsy's board of directors after the 1967 public offering. When Dempsey-Tegeler did an underwriting, it normally requested that one of its employees become a board member in order to keep apprised of operations and be afforded the opportunity to act as lead underwriter if a company should seek additional public financing. Dempsey-Tegeler served as Topsy's investment banker and was consulted on major business decisions and methods of financing through Halper and another Dempsey-Tegeler employee, Wells McTaggart.

The 1967 public offering followed close on the heels of Topsy's entering the franchising field. At the time of the offering, Topsy's had franchised six popcorn and ice cream shops in Missouri and Kansas, had executed leases for three additional locations, and was working to secure other suitable locations for franchise stores. Berger was aware that the price of Topsy's stock began to climb with the company's announcement that it was going into franchising, and there was a causal relationship

between the announcement and the improved performance of the stock. In the first quarter of 1967, the stock was selling between $1^{15}/_{16}$ and $2^{3}/_{16}$ per share. After the company's entry into the franchising of popcorn and ice cream shops, the stock was selling in the range of $7^{1}/_{2}$ to $11^{3}/_{4}$ per share.

In late 1967, Berger discussed with Wells McTaggart Topsy's desire to get into some type of fast-food franchising. Topsy's became interested in franchising roast beef restaurants about the time of the 1967 public offering. Topsy's discussed a merger with Arby's, which was already in the roast beef franchising business, but no merger took place. Topsy's employed a consultant to advise it regarding the establishment of such a franchising business and, at its April 1968 board meeting, approved continued investigation of roast beef franchising.

Topsy's first became aware of SaxonS in January or February 1968, when House visited a SaxonS restaurant in Columbus, Ohio. He was very impressed with the operation.

SaxonS had been incorporated since January 1967. The principal shareholders were William West, Leland Henry, and William Sapp. West acted as chief executive officer. Sometime after House's visit to Columbus, Berger and House spoke with a Mr. Nelson who had just purchased a SaxonS franchise and signed a franchise agreement for a Topsy's popcorn shop in Arizona. Nelson furnished them with some financial information, including projections about SaxonS units, and suggested that Topsy's contact West.

West was invited to Kansas City in the late spring or early summer of 1968. West discussed the operation of SaxonS, how it differed from other roast beef franchise businesses, sales, profitability, and locations of units. He indicated that he was interested in expanding SaxonS, but had insufficient capital, and that Sapp and Henry were interested in selling. Berger and House were aware that although West had originated the SaxonS concept, his restaurant experience dated only back to 1964. Prior to that time he had been in business

manufacturing and selling aquariums. Sapp and Henry had considerably more restaurant experience. Ralph Tucker was present at this meeting with West.

Berger and House made a trip to Columbus after West's visit to Kansas City. They looked at sales records of the various franchise units and records of the company unit. Using data which included wage costs, food costs, rent, and other expenses, Berger analyzed the financial information they had obtained from SaxonS and made projections relating to the operation of sandwich shops and profits that could be realized from the sale of franchises.

There is no indication that anyone from Touche Ross participated in these meetings with West, or assisted Berger in analyzing the financial and operating information Topsy's had obtained about SaxonS. Upon returning from Columbus, Berger decided that he wanted to purchase SaxonS for a price as high as $500,000.00.

**B.** *The Purchase of SaxonS and Activities Through October 29, 1968.*

1. *The Acquisition of SaxonS.* Having determined that Topsy's should purchase SaxonS, Berger sent House, Tucker, and Sharlip to Columbus on the last Saturday in July 1968. They returned to Kansas City the following evening. While in Columbus, Tucker reviewed the SaxonS franchise agreement and leases. He negotiated the price and terms of the sale which were to be laid out in the final document. House inspected the three Columbus units, evaluated menus and other aspects of operations, and worked out costs of goods and estimated labor costs to project profitability. Sharlip looked at financial records and spoke with George Noxon, SaxonS' controller.

In a letter dated August 6, 1968, Sharlip reported to Berger on his trip to Columbus. He included financial statements (unaudited) as of June 30, 1968, which had been prepared by Noxon. Sharlip presented alternative ways of recognizing income from franchise fees, all of which would be in accordance with sound accounting princi-

ples. The letter included a projection of royalties of $100,000.00, based on $225,-000.00 volume, from franchises sold to date. Sharlip also stated that "[p]rofit on equipment sales to franchisees, now on hand, is projected at approximately $200,000.00 during the next twelve-month period." The letter made no recommendation as to whether, in view of the records and statements, Topsy's should or should not purchase SaxonS. Sharlip's letter had no appreciable impact on Topsy's decision to purchase SaxonS, a decision which was actually made by Berger before the trip. Had Sharlip found that the records he examined revealed serious financial problems and communicated that information to Topsy's, the decision to purchase may well have been reversed. There is, however, nothing to indicate that he should have made such a discovery. The assumptions upon which the "projections" in the letter were based were regarded by Berger as conservative. It was recognized that Sharlip could not have acquired more in-depth information in the time allotted for the Columbus trip.

None of the alternatives for recognition of income from franchise fees, which Sharlip had listed in his letter, were ultimately used. Rather, it was determined that only $2,500.00 of the $10,000.00 fee would be recognized when a franchise was sold and the rest would be deferred. The result was that, in the final prospectus, SaxonS' net income was shown as $35,572.00 for the year ended July 31, 1968, whereas Noxon's financial statement showed net income of $82,300.00 for the year ended June 30, 1968. The amounts deferred would increase potential income after August 1, 1968, which would be included in Topsy's consolidated income. We find nothing suspect in this procedure.

An acquisition agreement was prepared and is dated August 1, 1968. Topsy's board of directors considered the acquisition at a special meeting on August 22, 1968. The directors present were Berger, Nuell, Sam Schultz, G. Kenneth Baum, and Jack Halper. Sharlip was not present. Berger told the meeting that SaxonS was well-managed by West, had great potential but insufficient capital, would accelerate Topsy's entry into the roast beef franchising field by several years, and probably create incalculable benefits for Topsy's. The acquisition agreement was distributed and a discussion, with many questions and answers, ensued. Berger told of a trip House and Tucker had taken to Columbus to negotiate and consummate the purchase after the preliminary dealing between himself and West. The purchase was unanimously approved.

The agreement called for Topsy's to purchase all of the outstanding stock of SaxonS in exchange for $300,000.00. West was given the option of taking his share in stock of Topsy's, if he continued as an employee of SaxonS. He stayed on as president and hence received restricted stock of Topsy's in lieu of cash. The purchase price was thus $203,915.00 in cash and 3,342 shares of Topsy's Class A Common Stock.

Unaudited financial statements as of June 30, 1968, a SaxonS sales brochure, a schedule of SaxonS leases, a schedule of buildings under construction, and a schedule of franchise agreements were attached to the acquisition agreement. The selling shareholders of SaxonS warranted that the financial statements had been prepared in accordance with generally accepted accounting principles, were correct and complete, and fairly presented SaxonS' financial position; that there had been no material adverse change in financial conditions since the date of the statements; that SaxonS had no direct or contingent liabilities not shown in the statements; and that SaxonS had paid all taxes due as of the date of the statements. The SaxonS shareholders agreed to indemnify Topsy's and SaxonS for any loss or expense that might result from a breach of any representation or warranty made by the sellers in the agreement.

2. *The "Audit" of SaxonS.* In September 1968, Sharlip told Paul Eppenaur, then a senior on the audit staff of Touche Ross, to go to SaxonS' home office to perform certain audit procedures on SaxonS' balance sheet as of July 31, 1968, so that a Touche

Ross opinion could be issued on Topsy's consolidated (including SaxonS) financial statements for the 1969 fiscal year. Berger testified that he had told Sharlip that he wanted a full audit and presumably an opinion. For reasons which will be discussed later and because, in light of the warranty in the purchase agreement, the need for a full audit at that time was not apparent, we find Eppenaur's understanding of what was to be done by Touche Ross to be credible and reasonable.

Eppenaur spent three days in Columbus, reviewed copies of unaudited financial statements, and became familiar with SaxonS' general ledger, other accounting records, and reports. He sent out confirmations of accounts receivable, accounts payable, and lease deposits. His field work was basically concerned only with the balance sheet of SaxonS as of July 31, 1968. His investigation of subsequent events was only related to the determination of how to account for franchise fees, with an IRS review of SaxonS' 1967 tax return, and with making routine inquiries of SaxonS' management as to whether there had been any material adverse changes between July 31, 1968 and the time he left Columbus. Herbert Martin, Topsy's controller, understood that these procedures did not involve an audit of SaxonS' statements of earnings for any period and that such an audit would have required more extensive procedures.

Upon his return to Kansas City, Eppenaur examined the SaxonS franchise agreements, leases, and corporate minutes that existed as of July 31, 1968. This review of franchise files took place in the office of John Jouras, a member of the Tucker Charno firm; its purpose was to obtain information to assist Touche Ross in advising Topsy's regarding the way SaxonS was to account for franchise fee income as of July 31, 1968.

Until March 1969, Eppenaur did not expect to issue an audit opinion as a result of the procedures he undertook other than Touche Ross' opinion on the Topsy's consolidated financial statements for fiscal year 1969. We are not persuaded that any other Touche Ross personnel had such an expectation. When Eppenaur learned in March that an opinion was expected, he finished the audit schedules he had begun, prepared a trial balance, drafted a balance sheet, and wrote an audit memorandum. The opinion was issued on May 7, 1969. The report was dated September 11, 1968—the date on which Eppenaur had completed his field work in Columbus. The balance sheet contained a footnote, dated February 13, 1969, regarding SaxonS' federal income tax liability as of July 31, 1968. Touche Ross had received an IRS report on February 13, 1969, pertaining to SaxonS' tax liability.

3. *The Operation of SaxonS as a Topsy's Subsidiary.* The acquisition agreement contained specific provisions relating to leases of units in Ft. Lauderdale, Florida, and Columbus, and the home office building also in Columbus all of which were guaranteed by the selling shareholders. The agreement provided:

Buyer agrees to execute a document substituting Buyer for Sellers as guarantors on said leases to the same extent that Sellers have guaranteed same, provided that the Landlord in each such lease consents to the substitution. In the event the Landlord does not consent to the substitution above provided, Buyer agrees to indemnify and save Sellers harmless from the liability created by said guarantees, or any of them. Sellers may at their option elect to pay the commitment premium and Buyer will apply for and obtain insurance guaranteeing payment of periodic rental installments for the term of the leases or fifteen (15) years, whichever is less.

As a further inducement to Landlord to eliminate the contingent liability of Sellers on the leases for the Units at Ft. Lauderdale, Florida and at 5400 N. High Street, Columbus, Ohio, Buyer agrees to purchase the Ft. Lauderdale Unit for the sum of $215,000 and to assume liability equally with SaxonS, Inc. on the lease for 5400 N. High Street, Columbus, Ohio.

While this section of the agreement is by no means crystal clear, we understand it to

mean that Topsy's had certain options with regard to the Ft. Lauderdale unit, one of which was the purchase thereof. In fact, Topsy's purchased the Ft. Lauderale unit about September 7, 1968, for $214,900.00. Topsy's later recorded the purchase price on its books as an intercorporate debt owed to it by SaxonS.

At the time of the acquisition, a SaxonS unit was under construction in Waco, Texas. The unit was to occupy a building leased by SaxonS. Paragraph 4 of the agreement provided:

> After thirty (30) days from the date hereof, Buyer reserves the right to cancel this agreement in the event Sellers are unable (a) to revise the lease on property in Waco, Texas, identified in Exhibit C as lease from Elmco, Inc. so that the minimum rental provided therein is Eighteen Thousand Dollars ($18,000) per annum; or (b) to secure an option to purchase said property so that SaxonS will not be required to pay a purchase price exceeding the sum of One Hundred Eighty Thousand Dollars ($180,000), which may be exercised by Buyer or SaxonS, Inc. or (c) to lease said property to a franchisee with a net worth of at least One Hundred Fifty Thousand Dollars ($150,000). If Sellers should determine that they are unable to accomplish either (a), (b), or (c) above, they may at any time up to thirty (30) days from the date hereof so notify Buyer by certified mail. Buyer may then within five (5) days after receipt of such notice elect to remove its right to cancel this agreement; in such event or if Sellers accomplish either (a), (b) or (c) above, the parties shall proceed to completely perform this agreement.

The record does not reveal the efforts, if any, of the selling shareholders to attempt to comply with these alternatives. About September 30, 1968, however, Topsy's purchased the Waco property from Elmco, Inc. for $179,000.00 and later charged the purchase price to SaxonS.

In early August 1968, before the acquisition was approved by Topsy's board, Berger and House met with Edward Manzione, a food service consultant. Manzione was later hired as SaxonS' director of operations. Also in early August, Berger met in Kansas City with Hary Weinberg, general administrative manager of Shakey's, Inc. Berger offered Weinberg the job of operating head of SaxonS. Weinberg did not accept because, as he told Berger, he believed the concept was not viable. Weinberg understood that Berger envisioned growth and expansion for SaxonS.

After the acquisition, Topsy's changed the name of the company from SaxonS Inc. to SaxonS Sandwich ShoppeS, Inc., and elected a new board of directors: Berger, House, and West. West was elected president, House vice-president, and Berger secretary-treasurer. Berger made a number of trips to Columbus to familiarize himself with SaxonS' operations and visited units in operation and under construction elsewhere. George Noxon resigned as controller of SaxonS and was replaced by David Henry.

Herbert Martin, Topsy's controller, went to Columbus to inspect SaxonS' books and records. West had responsibility for day-to-day operations and, with David Henry, prepared weekly and monthly financial reports which were forwarded to Topsy's for review by Martin, House, and Berger.

James Jouras accompanied Berger on one of his trips to Columbus. He, thereafter, handled the legal work related to SaxonS' franchise operations, including the preparation of franchise agreements, equipment contracts, and leases.

4. *Kansas City Star Article, August 23, 1968.* The first public information about Topsy's acquisition of SaxonS was contained in a news article written by Ben Schifman, then the Star's financial editor. Schifman and Berger were personal friends and Schifman later became a director of Topsy's in 1978. The article cited Berger as the source of the information. It indicated that SaxonS had nine units in operation and under construction in Ohio, Michigan, Texas, and Florida, that negotiations were pending for ten locations in Kentucky, Georgia, Florida, and Ohio, that the company planned to open six company-owned

units in the Kansas City area, and that William West would continue to head the operation. Actually, there were eight units in operation and ten under construction as of July 31, 1968. Twelve additional franchises had been sold as of July 31, 1968. Plaintiffs have not proven that Topsy's did not plan to open six units in Kansas City. While Berger had offered a position as operating head of SaxonS to Harry Weinberg, the offer was not accepted. Plaintiffs have not shown that at the time of the article it was not anticipated that West would continue as head, at least for a time. There is no evidence that Touche Ross was in any way responsible for Schifman's article.

5. *The 8–K Report, September 23, 1968.* Tucker Charno handled the preparation of this report, which was signed by House as president of Topsy's. The acquisition of SaxonS was described and an unaudited balance sheet for SaxonS as of July 31, 1968, a profit and loss statement for the twelve months ended July 31, 1968, and a copy of the acquisition agreement with exhibits, including sales figures for two units (the "pilot" unit in Columbus and the Pompano Beach, Florida, unit) were attached. There is no proof that this document contained materially misleading information or that Touche Ross had anything to do with its preparation.

6. *Topsy's Letter to Shareholders, September 26, 1968.* This was Topsy's first direct communication with its stockholders about SaxonS. The letter was signed by House and stated that SaxonS had twenty-one units in operation or under construction. This was the same number reported in the Star article of August 23, 1968. House testified at trial that construction had begun on additional units between July 31 and September 26, thus there was no misrepresentation.

The letter also stated that SaxonS employed approximately one hundred people. This information was obtained by House from West. There was no direct evidence of the number of persons actually employed by SaxonS at the time of the letter. While it is perhaps unlikely that SaxonS directly

employed that number, fast food operations commonly employ large numbers of part-time employees. Furthermore, were the employees of franchisees considered as SaxonS employees, the total would be well over one hundred. This cannot be regarded a material representation.

West is described in the letter as an "experienced restauranteur and franchiser" who would continue to head the operations. We have considered West's continued employment above. He had approximately three years experience with SaxonS. Although whether the operator of a fast food franchising operation can fairly be called a "restauranteur" is debatable, we do not find this statement to be materially misleading.

7. *The Registration Statement and Preliminary Prospectus.* After the acquisition of SaxonS, Topsy's began discussions with Wells McTaggert of Dempsey-Tegeler about a public offering of securities to obtain capital for the expansion of SaxonS. Berger, House, Nuell, Tucker, and West decided to make a secondary offering of personally held shares of Topsy's Class A Common Stock.

Topsy's and Dempsey-Tegeler executed a letter of intent to proceed with a public offering of $4 to $6 million in convertible debentures pursuant to an SEC registration statement. The letter of intent, dated October 7, 1968, required a consolidated balance sheet of Topsy's as of July 31, 1968, and a consolidated income statement for Topsy's and its subsidiaries for the year ended July 31, 1968, both to be certified by Touche Ross.

McTaggert consulted with Dempsey-Tegeler's counsel, Bryan Cave, about the letter of intent and asked Bryan Cave to perform the "blue sky" work to insure that the offering complied with state securities laws. Jack Lerner was the Bryan Cave partner who worked on the offering. Lerner drafted the indenture pursuant to which Topsy's debentures were to be issued and was particularly concerned with the description of the underwriting and of the debentures, which would be in the preliminary prospec-

tus portion of the registration statement. He had had extensive experience in preparing public offerings.

Tucker asked James Jouras to assist him and the attorneys for the underwriters in preparing the registration statement. Jouras had not worked on a registration statement before. Tucker gave him the statement used in Topsy's 1967 offering and other prospectuses to serve as models.

On October 16, 1968, an "all hands" meeting for the 1969 offering was held in the Tucker Charno office in Kansas City. The meeting was a lengthy one and Jouras, Lerner, Sharlip, McTaggert, Tucker, Berger, House, and several other Topsy's and Touche Ross personnel were present for some or all of the meeting. Drafts of the narrative portion of the prospectus had been prepared by Jouras and the material was edited at the meeting. Lerner's impression was that Sharlip provided information, especially figures, relating to SaxonS. We find nothing particularly significant in that. The figures were in documents equally available to Jouras, Tucker, Berger, Nuell, and Herbert Martin.

After the meeting, Lerner returned to St. Louis and gave the draft to the printer. The first printed proof was dated October 19, 1968. It was a complete draft except for the audited financial statements of Topsy's, which were given to Jouras by Touche Ross and included in a proof dated October 23, 1968. As they were obtained from the printer, the proofs were given to Berger, House, Martin, the underwriters, and Touche Ross; Tucker asked for comments from each. Tucker told Berger and House to review the documents carefully, particularly the section on SaxonS, to insure that the information was accurate. Comments were directed to Jouras who made necessary changes and forwarded them to Lerner.

Touche Ross, primarily through Paul Eppenaur, assisted Topsy's controller in preparing Part II of the registration statement, which consisted of detailed financial schedules. Touche Ross personnel read the narrative portions of the preliminary prospectus to assure themselves that nothing in those portions was inconsistent with the audited financial statements of Topsy's. Touche Ross understood that this was the extent of their responsibility, but also believed that if they observed misrepresentations or critical omissions, such items should be brought to the attention of Topsy's and/or Topsy's attorneys.

The registration statement, including the preliminary prospectus, the agreement among underwriters, and the indenture were forwarded to the SEC on October 29, 1968, by Tucker. The registration statement was signed by Berger, House, and Nuell as officers, and West, Sam M. Schultz, G. Kenneth Baum, Halper, and Mark Pierce as directors of Topsy's. Berger, House, Nuell, West, and Tucker, as selling shareholders, filed statements with the SEC that they had read the registration statement and were familiar with its contents, and that they had knowledge of Topsy's and were not aware of any material adverse information about Topsy's that was not disclosed in the registration statement. West and Tucker later decided not to participate as selling shareholders.

In connection with the offering, McTaggert and Tucker advised Topsy's to declare a stock split in the form of a stock dividend. The purpose was to make Topsy's stock more attractive to investors by increasing the number of shares being traded and reducing the market price per share. Halper proposed the split at the October 18, 1968 meeting of Topsy's board; it was unanimously approved.

After Dempsey-Tegeler had obtained Topsy's letter of intent, its Syndicate Department put together an underwriting group. Copies of the registration statement (including the preliminary prospectus, the draft underwriting agreement, and other underwriting documents) were distributed to prospective underwriters. Each participating underwriter executed a power of attorney appointing Dempsey-Tegeler personnel as agents and attorneys-in-fact for purposes of the underwriting. Each signed an Agreement Among Underwriters autho-

rizing Dempsey-Tegeler to act as its representative in executing the Underwriting Agreement, in taking necessary action to carry out the Underwriting Agreement, and in taking necessary action to carry out the sale and distribution of the offered securities. The underwriters agreed that any action taken by Dempsey-Tegeler would be binding on them, and they also executed a Selected Dealers Agreement detailing the mechanisms of the offering. Twenty-three underwriters participated in the offering.

Dempsey-Tegeler, as representative of all the underwriters, entered into the Underwriting Agreement, which set out the obligations of the parties, with Topsy's and the selling shareholders. In this document, Topsy's represented and warranted to the underwriters that, *inter alia*, there had been compliance with the 1933 Securities act and SEC regulations, that the registration statement and prospectus, when they became effective, would fully comply with the Act and regulations and would not include any untrue statements of material fact or omit to state material facts, and that there had been no material adverse change in the condition of Topsy's since the date of information in the registration statement and prospectus.

The obligations of the participating underwriters were subject to a number of conditions, including the following: representations by Dempsey-Tegeler and Bryan Cave that the registration statement and prospectus contained no material misstatements or omitted necessary facts; a legal opinion from Tucker regarding a number of legal requirements; a legal opinion from Bryan Cave relating to certain legal matters; certificates from Topsy's chairman of the board and president that there was no material misrepresentations or omissions; and a letter from Touche Ross representing that the certified financials conformed with the requirements of the Securities Act and regulations. The letter from Touche Ross was to state additionally that nothing had come to Touche Ross' attention which had given them reason to believe that the unaudited sales, net earnings, and net earnings per share for the four-month periods ended

November 30, 1967 and 1968, did not comply with the Act and regulations and were not prepared substantially in accordance with accounting practices followed during prior fiscal years (the "cold comfort letter").

Although it was the usual practice in 1968 and 1969 for the underwriters to hold a "due diligence meeting" of all interested parties prior to the effective date of an offering to assure the underwriters that they had satisfied their obligations under the securities laws, such a meeting was not held with regard to the Topsy's 1969 offering. McTaggert decided that this was not necessary because the underwriters' obligation of diligence had been satisfied in connection with the 1967 offering. He attempted to satisfy the due diligence obligation by engaging in lengthy discussions with Berger about SaxonS.

8. *G. H. Walker Research Report, October 10, 1968.* During 1968 and 1969, William Gill, Jr., was a securities analyst with G. H. Walker & Co., one of the underwriters of the 1969 offering. Gill was very interested in the fast food industry as presenting good prospects for growth and profit. He first learned about Topsy's in September 1968, when he heard about the acquisition of SaxonS. He traveled to Kansas City and had extensive discussions with Berger and House. On September 18, he spoke again with House. On September 25, he traveled to Columbus and met with West. He spoke again with House on October 2, and with West on October 4. Many of management's statements, particularly those relating to sales in SaxonS units and units open or under construction, were contradictory.

A research report by Gill was published by G. H. Walker on October 10, 1968. The report stated that there were ten SaxonS units in operation and twenty-nine under construction. The SaxonS franchise card file reveals that ground had been broken on only seven units other than those already open at that time. An internal SaxonS document of December 13, 1968, showed that, as of November 20, there were ten units under construction and two additional

sites available for construction. The reference to twenty-nine units is a misrepresentation attributable to Topsy's/SaxonS management.

The report also states that by the end of 1969 there should be fifty units in operation. This was an overly optimistic forecast.

The report states further that "[w]hile there is yet only limited evidence, since only one unit was in operation prior to 1968, the indicated average annual volume of a SaxonS unit appears to be about $300,000, a good level." Again, we have no direct evidence of the average annual volume of SaxonS units. Gill received different rough estimates from the persons with whom he spoke. Because the statement is qualified by the mention of the limited operating history of SaxonS, it does not appear to be a material misrepresentation.

There is no indication that Touche Ross had anything to do with the preparation of the G. H. Walker report.

There are, of course, troubling aspects of the report in addition to the misrepresentation of the number of units under construction. Gill clearly sought and was given inside information from management. Berger, House, and West tossed information about quite casually. Obviously, none of them seemed to have any appreciation of the need for accuracy and the restrictions on dissemination of inside information.

9. *Kansas City Times Article, October 11, 1968.* Ben Schifman's column of this date reported that Jerry Berger expected SaxonS to "make a substantial contribution to profits in the current fiscal year." Berger was credited with saying that sixty-three franchises were sold within the last month, and each franchisee paid $10,000.00 to SaxonS. This is clearly a misstatement. The SaxonS card file shows that franchise agreements were signed or franchise fees were received for five franchises during the months of September and October. The great disparity warrants the conclusion that this is a material misrepresentation. There was no correction or retraction subsequently printed. We are satisfied that Berger made the statement either with full knowledge of its untruthfulness or out of his reckless indifference to the truth. The article also states that six units are now under construction. This stands in sharp contrast to the number shown in the Gill report. Berger was aware of the Gill report and made no effort to correct Gill's misapprehension or, if the Gill report was closer to the truth, to correct the Schifman article. The article also contains Berger's prediction that each shop will average $300,000.00 in annual sales, which is the amount that appeared in the Gill report.

C. *From the Filing of the Registration Statement Through the Closing of the Offering.*

1. *Topsy's 1968 Annual Report.* Topsy's annual report was distributed to shareholders in late October 1968. It contained financial statements audited by Touche Ross for the fiscal year ended July 31, 1968. The accountants' report did not express an opinion regarding any financial statements of SaxonS and referred to SaxonS only in Note 10, Subsequent Events: "On August 1, 1968, the Company acquired all the outstanding stock of SaxonS Sandwich ShoppeS, Inc., a company engaged in the development of a chain of specialty sandwich shops. The Company purchased the stock of SaxonS for $203,915 cash and 6,684 shares of Class A Common Stock." There are no allegations that these certified financials contained any misrepresentations.

The Message From Management section of the report stated that SaxonS received a $10,000.00 fee from each unit franchised. It has been suggested that this was misleading because no mention was made of the fact that not all franchise fees had been collected, $7,500.00 of the franchise fee was refundable, and several refunds had been made, in some cases the entire $10,000.00 previously paid and in others only the $7,500.00 refundable under the franchise agreement. We do not believe the omission makes the statement made materially misleading. Details about actual refunds would not have been expected in the context of the one-page Messsage From Man-

agement. Furthermore, were the statement misleading, Touche Ross cannot be charged with responsibility for it. Its legitimate concern was with statements in the annual report that might be inconsistent with the certified financials, and footnote 10 was the only aspect of the financials dealing with SaxonS. While some Touche Ross personnel were aware of the refund situation, Touche Ross cannot be charged with being management's keeper.

Included with the report mailed to shareholders was a large postcard bearing a picture of a SaxonS unit on one side and information about SaxonS on the other. It stated that, in addition to those units open, "there are twenty-nine SaxonS units in various stages of finished design and/or construction." An internal SaxonS-to-Topsy's progress schedule of December 13, 1968, showed that as of November 20, 1968, eleven units were in operation, ten units were under construction, two sites were available for construction, and nine franchisees were awaiting sites. The statement on the postcard was a misrepresentation. The postcard was prepared by House, Tucker, and West. Touche Ross bears no responsibility for the statements and had no duty to monitor them.

2. *Kansas City Times and Star Articles.* Ben Schifman's column in the *Kansas City Times* of October 30, 1968, quoted a statement from the Message From Management section of Topsy's annual report that no long-term debt had been created during fiscal 1968 or since "even though about $400,000 was expended for SaxonS locations and $837,000 for new fixtures for Topsy's operations." Plaintiffs claim that this was misleading because it failed to mention that a short-term $400,000.00 loan had been used to purchase two SaxonS units. Given the context of the statement, we conclude that it was not misleading.

News of the public offering appeared in Schifman's column in the *Kansas City Times* of November 1, 1968. The article reported on the use of proceeds, and was apparently based on statements that appeared in the preliminary prospectus:

About $600,000 will be added to working capital to replace the $200,000 to purchase SaxonS and $400,000 that went to purchase two properties formerly leased by SaxonS. The company estimates that about $200,000 is required for each SaxonS unit. Presently the plans call for the addition of about 50 SaxonS units to be owned by the company or leased to franchisees.

Schifman's column in the *Kansas City Star* of November 22, 1968, reported Topsy's earnings for fiscal 1968, which were up considerably from the previous year. There is no mention of SaxonS by name, but Berger is reported to have said that the company had eleven franchise units in operation, ten more under construction, and fifty-nine in planning stages. The figures for the units open and under construction correspond to those in SaxonS internal progress report. The meaning of the phrase "in the planning stages" is nebulous and hence not particularly significant. Furthermore, the internal progress report showed nine franchisees awaiting sites and fifty "other options on franchises or rights of first refusal." These might well be considered to be "in the planning stages."

There is nothing to indicate that Touche Ross had anything to do with these articles.

3. *Topsy's Letter to Shareholders, December 18, 1968.* This letter from House reported a continuation of growth in sales and earnings for the first three months of fiscal 1969 "accentuated by the addition of SaxonS Sandwich ShoppeS, Inc." There is nothing to indicate that the figures were false in any way. The "accentuated by" language is essentially meaningless and has not been shown to be misleading.

4. *Kansas City Star and Times Articles.* Ben Schifman's column of December 19, 1968, contained a report of the net earnings and earnings per share of Topsy's for the first quarter of fiscal 1969—information that had been included in House's letter to shareholders.

A *Kansas City Star* article of January 12, 1969, by Ted Pollard, entitled "Companies

Grow by 'Going Public'," contained several paragraphs about Topsy's, but no misrepresentations.

5. *The Final Prospectus.* The final prospectus, dated February 4, 1969, contained numerous statements, almost all of which appeared in the preliminary prospectus, that plaintiffs claim were misleading.

■ One preliminary matter must be considered before examining particular representations and omissions. Note (11), Subsequent Events, of the July 31, 1968 certified financial statements of Topsy's read as follows: "For information relating to the subsequent acquisition of all the outstanding stock of SaxonS Sandwich ShoppeS, Inc. see 'SaxonS Sandwich ShoppeS, Inc.' under 'Business' elsewhere in this Prospectus." Plaintiffs argue that the footnote operated as an incorporation by reference of the SaxonS section of the "Business" portion of the prospectus into the certified financials. Were this the case, Touche Ross would be directly liable for misrepresentations and misleading statements resulting from omissions in the SaxonS narrative.

The court in *Escott v. BarChris Construction Corp.,* 283 F.Supp. 643 (S.D.N.Y.1968), an action brought under Section 11 of the Securities Act of 1933, noted that the parties in that case disagreed as to what portions of the prospectus had been "expertized" by the accountants and stated:

> Some defendants say that it was only the 1960 figures (and the figures for prior years, which are not in controversy here). Others say in substance that it was every figure in the prospectus. The plaintiffs take a somewhat intermediate view. They do not claim that Peat, Marwick expertised every figure, but they do maintain that Peat, Marwick is responsible for a portion of the text of the prospectus, i. e., that pertaining to "Methods of Operation," because a reference to it was made in footnote 9 to the balance sheet.
>
> Here again, the more narrow view is the correct one. The registration statement contains a report of Peat, Marwick as independent public accountants dated

February 23, 1961. This relates only to the consolidated balance sheet of Bar-Chris and consolidated subsidiaries as of December 31, 1960, and the related statement of earnings and retained earnings for the five years then ended. This is all that Peat, Marwick purported to certify. It is perfectly clear that it did not purport to certify the 1961 figures, some of which are expressly stated in the prospectus to have been unaudited.

> Moreover, plaintiffs' intermediate view is also incorrect. *The cross reference in footnote 9 to the "Methods of Operation" passage in the prospectus was inserted merely for the convenience of the reader. It is not a fair construction to say that it thereby imported into the balance sheet everything in that portion of the text, much of which had nothing to do with the figures in the balance sheet. Id.* at 683–84 (emphasis added).

We find the approach taken in *Escott* to be the correct one and hold that Touche Ross has no direct responsibility for the SaxonS narrative as a result of note (11). The footnote does not serve to incorporate that portion of the narrative into the certified financial statements. This does not, of course, mean that Touche Ross may not be liable secondarily, as an aider-abettor, for misrepresentations in or omissions from narrative portions of the prospectus.

(a) *The SaxonS Section of the Prospectus.* Material about SaxonS appeared on pages 10 and 11 within the "Business" portion of the prospectus. It stated that "[a]lthough SaxonS has been open less than two years, it has ten sandwich shops open and operating in Cleveland and Columbus, Ohio, West Palm Beach, Pompano Beach, Fort Lauderdale and North Palm Beach, Florida, and Waco, Texas." This was inaccurate. Berger, House, and Tucker all testified that there were fourteen units open on February 4, 1969. The SaxonS card file also shows fourteen units open at that time.

The prospectus states further: "Two units are presently Company-owned and operated, including the pilot unit in Columbus, Ohio, adjoining SaxonS home office build-

ing." The pilot unit and Waco unit were company-owned and company-operated. Plaintiffs claim that the statements regarding the number of units in operation were misleading because they omitted mention of the fact that five franchised units were being operated by the company as of February 4, 1969. The decision not to make a distinction between franchisee-operated and company-operated franchised units was made by Jouras and Lerner. Plaintiffs have not shown that such distinction would have been significant to an investor.

Plaintiffs also claim that the aforementioned statements were misleading because there was no mention of the "fact" that all SaxonS shops were having operational problems. It is clear that several franchised units were having some problems, and that some franchisees were not satisfied with their operations and had become disenchanted because of poor sales. In those cases SaxonS was asked to operate the franchised units. These statements, however, say nothing about the success of SaxonS units, and indeed carry an implicit warning by noting that the operation is less than two years old. Operational problems are inherent in businesses, and are more to be expected in new businesses than in established operations. There is nothing to suggest that Topsy's/SaxonS management perceived the operational problems of some units to be overwhelming or insoluable. Were this the case, operational problems might well be a "*material* fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Ed Manzione, who had been hired as SaxonS director of operations in August 1968, was well aware of difficulties with specific units (in particular, poor local management and supervision), problems presented by the fact that some units were widely scattered, and troubles stemming from West's limited capabilities as a management person as distinguished from a more "creative promoter type." Manzione did an extensive analysis of SaxonS operations in December 1968, however, and the essence of his report as transmitted to Topsy's/SaxonS management was that

improvement was possible and potential for success was present.

The prospectus indicates that the pilot unit in Columbus had gross sales of approximately $413,000.00 in its first year of operation. No sales figures are given for other units. The parties apparently agree that the sales figure given is accurate. Plaintiffs, however, argue that the statement is misleading because the annual volume of $413,000.00 was not representative of other units open and operating at that time, and because the trend in sales at the pilot unit had been downward from its opening date in July 1967, and all SaxonS shops had a similar trend. We note initially that a sales figure, standing alone without cost data or comparative figures for similar operations, is of little significance. The statement in the prospectus does not purport to claim that the sales figure is representative. The very fact that the unit was a "pilot" unit adjacent to the home office would alert a reasonable investor to the possibility that sales might well be expected to be higher, assuming that management would be putting special energy into the operation. Indeed, Berger, House, and West told Tucker and Jouras that the pilot unit was the only operating unit which had the type of location and supervision that Topsy's expected to offer in all units. On the other hand, the Gill report and an October newspaper article showed that management expected average sales of $300,000.00 for each unit.

Sales of the pilot unit did show a decline. The unit opened during July 1967, and its first year ended July 11, 1968. During the year from August 1, 1967 to July 31, 1968, sales were about $393,000.00. Sales for the year ended December 31, 1968, were about $309,000.00. According to the Manzione report, all SaxonS units experienced a downward trend after opening with large sales. Manzione noted that most successful fast food operations experienced downward trends the second month of operation, but that the trend was usually reversed shortly thereafter.

The question is whether the downward trend of sales at the pilot unit and other

units was an omission of material fact necessary to make the statement made not misleading. In light of the limited significance of the isolated sales figure given, and the short operating history of SaxonS, we are reluctant to find the omission of the sales trend material. Additionally, were it material, responsibility must fall on management and the attorneys who drafted the narrative portions of the prospectus. There is nothing to indicate that Touche Ross contributed to the decision to include the reference to first-year sales of the pilot unit or the decision, if such was consciously made, to omit an explanation of sales trends of the pilot units and other units. While there was conflicting testimony as to who "supplied" the dollar amount that appears in the prospectus, we find that West originally provided pilot unit sales figures to Tucker, Berger, and House when he visited them in Kansas City in July 1968. All of the figures relevant to this statement and the alleged omission were clearly within the province of Topsy's management and its attorneys. While on a particular occasion, Touche Ross may have been asked for or volunteered a specific figure from the materials it had assembled, that does not mean that Touche Ross is responsible for the inclusion of that figure in the narrative portion of the prospectus. Such activity would not constitute the significant assistance that is the earmark of aiding-abetting liability.

The prospectus stated that in addition to the units open and operating, there were ten units in various stages of construction, expected to be open by early 1969, and stated further:

> These are located in Columbus, Cincinnati, Toledo and Dayton, Ohio, Grand Rapids, Michigan, Miami, Florida, Philadelphia, Pennsylvania, and Tucson, Arizona. In addition, franchises for 20 units have been sold or are in various stages of site selection and lease negotiations in cities throughout the United States. Some franchisees are obligated to open additional units over a prescribed period of time to protect their exclusive territorial rights.

As we indicated earlier, the number of units open was understated. The SaxonS card file shows that only six units were under construction on February 4, 1969. Ten units were under construction on October 30, 1968; five of these had been opened by February 4, 1969, and construction had begun on one additional unit. In light of the understatement of the number of units open, we do not believe that the overstatement as to the number of units under construction is a material misrepresentation.

With regard to the statement of additional franchises sold or "in various stages of site selection and lease negotiations," the SaxonS card file shows that as of February 4, 1969, twenty-three franchises had been sold for which no shop had been opened and no construction begun. Given the broad language of the statement, we find that it is not misleading. Also, plaintiffs have not shown that the statement relating to the obligation of some franchisees to open additional units was a misrepresentation or even misleading.

The prospectus contained a description of the typical SaxonS building. While an art historian might well quarrel with the statement that the building was designed in the "style of 16th century SaxonS architecture," this is not an actionable misrepresentation. The prospectus stated that each unit was constructed as a free standing building. In fact, the unit then being constructed in Tucson, Arizona, was not free standing. Likewise, this misrepresentation is not material.

The prospectus also described SaxonS leases, including the lease arrangement for the home office:

> Except for two tracts of land, in Fort Lauderdale, Florida and Waco, Texas which are owned by SaxonS, all other units are located on land held under leases. The SaxonS home office is situated in a two story structure of 10,000 square feet built in 1968 especially for occupancy by SaxonS. It has also incorporated in its architecture the Old English architecture found in the SaxonS Sandwich

ShoppeS as described above. This building is occupied by SaxonS under a lease which expires in 1978 with three five-year renewal options. The annual rental is $17,434 for the initial term. For the renewal periods the annual rental will be adjusted in proportion to the Consumers Price Index.

.    .    .    .    .

When a location has been evaluated and approved, SaxonS will in most cases lease the site directly from the owner, who in turn will construct the SaxonS Sandwich Shoppe in accordance with plans, designs and specifications provided by SaxonS. Upon completion of construction, SaxonS subleases the completed unit to the franchisee, unless the location is one which SaxonS elects to retain and operate. The duration of the franchise agreement is commensurate with the term of the lease or sublease for the site.

Plaintiffs claim that these statements were misleading because they omitted mention that the annual rental on the pilot unit in Columbus was higher than the rental for the home office, and did not disclose the aggregate amount of lease obligations on the other units. Exhibit A(5) of the SaxonS acquisition agreement described the rental figure on the pilot unit as $9,508.52 for six months. The acquisition agreement had been filed with the SEC as a part of Topsy's 8–K report. We fail to see how the fact that the pilot unit's rental was approximately $1,500.00 per year more than that of the home office is material. The buildings were different in type and purpose; rent on the home office would be paid out of general revenue, while rent on the unit would be paid out of revenue generated by that unit. We are of the opinion that a comparison of the rentals for these two units would be of no real significance to a reasonable investor.

Plaintiffs have not shown that the statements made are misleading in the absence of statements as to the aggregate of lease obligations. There was no hard evidence showing what the aggregate amount was as of February 4, 1969, and nothing to show how such figures would affect the general mix of information available to a prospective investor. The record does contain a schedule of leases as of August 2, 1969, prepared by Touche Ross. This is only a summary, however, and in most cases, the rental obligation is merely described as a percentage of the franchisee's investment or sales. After reviewing these, Paul Eppenaur was able only to guess that the average annual rental would have been between $15,000.00 and $18,000.00. Thus, the aggregate would not differ greatly from an extrapolation made from an assumption that the one rental figure given was average. We find no actionable omission.

The sixth paragraph of the SaxonS section of the prospectus stated:

SaxonS' primary activities since its founding have been the development of its internal organization and the hiring of key personnel, the sale of franchises in selected metropolitan areas, and the development of new locations. Uniform operating procedures have been established and are incorporated in a comprehensive operations manual which is distributed to franchisees. Strict adherence to the manual is required of all franchisees. All management personnel are required to undergo a thorough training program at SaxonS' home office in Columbus, Ohio as a prerequisite to operating a SaxonS Sandwich Shoppe.

Plaintiffs' principal quarrel with these statements relates to the administration of uniform operating procedures. The statements were drafted by Jouras, who relied on information from West and SaxonS literature. House testified that there was an operations manual which laid out uniform operating procedures at the time, and that there was a training program. Manzione was dissatisfied with both the manual and the program and revised the manual and expanded the training program. We have some question as to whether the manual was indeed "comprehensive," whether "strict adherence" was actually "required," and whether the training program could

fairly be characterized as "thorough." Plaintiffs have not, however, proven that the statements were false. We have insufficient evidence to make any finding related to the quality of the procedures and training.

We are faced with the same problem in considering the statement in the prospectus describing the services which SaxonS provided to its franchisees:

> SaxonS provides each franchisee with a wide range of services, including a comprehensive purchasing program, a planned monthly advertising program, modern cost control and accounting procedures, public and employee relation aids, continual management supervision and assistance, and a field inspection service designed to maintain a high standard of uniformity and quality.

The "comprehensive purchasing program" appears to have been an arrangement with a purveyor in Chicago, which SaxonS recommended to its franchisees. House testified that West had established an advertising program, but there is no evidence as to its details. Berger, House, and Manzione were dissatisfied with the program and House testified that sometime after the Manzione report a new advertising firm was hired. The evidence does not show the date of this and does not reveal details. We can make no determination of whether at the time of the prospectus there was a "planned monthly advertising program."

Some cost control and accounting procedures had been developed by West. There is nothing in the record which would allow us to make a determination of whether they were "modern." The record does not reveal what "public and employee relations aids" were provided. "Continued management supervision and assistance, and a field inspection service" consisted of SaxonS' area supervisors visiting franchisees to assure that the units were clean and the service proper. Manzione's report suggested improvement in all of these areas. The evidence fails to show whether improvements had been made, or what the status of services was of February 4, 1969.

Jouras obtained the information in these statements from West; Berger and House were familiar with the operation and in a position to know whether they presented a fair picture. There is no evidence that Touche Ross had any knowledge that the statements did not fairly present the services provided to SaxonS franchisees.

With respect to what was required of franchisees under the franchise agreements, the prospectus stated:

> The initial investment required for each franchise is $30,000, which includes (1) an initial franchise fee of $10,000, (2) a down payment on equipment and fixtures of $10,000, and (3) a lease security deposit of $10,000. In addition, the franchisee is required to have sufficient operating capital with which to begin business. The franchise agreement also requires the payment to SaxonS of a 3% franchise royalty on gross sales. A total of 4% of gross sales is expended for advertising, 1% by SaxonS for regional and national advertising and 3% by either SaxonS or the franchisee at the local level.

Plaintiffs have claimed that the statement relating to the requirement of an initial franchise fee of $10,000.00 was misleading because there was no disclosure that the franchise fees had not always been collected, or that a portion of the fee was refundable if a site for the franchise unit was not located. In drafting this statement Jouras was attempting to describe what was contractually required of a franchisee.

The SaxonS card file shows that as of February 4, 1969, franchise agreements had been executed for fifty-three franchises, including blanket agreements covering more than one franchise. The blanket agreements were executed before SaxonS' acquisition by Topsy's. Of the fifty-three agreements, the initial fees had been paid when the agreement was signed or within days afterwards in thirty-two cases. In the case of the North Palm Beach franchise, half the fee had been paid a month after the agreement was signed, and the other half paid when the unit was opened in March 1968. Half the fee for the Harper Woods, Michi-

gan, franchise was paid when the agreement was signed on December 18, 1968, and the rest was to be paid when the lease was signed. The remaining nineteen franchises, for which initial fees had not been collected, were blanket agreements for more than one franchise.

Under the franchise agreement, if a location for the unit was not agreed upon within eighteen months, the franchisee had a right to terminate the agreement and be refunded $7,500.00 of the fee. SaxonS accounted for this by deferring $7,500.00 of each fee until a lease was signed. We do not believe that the statements relating to the initial fees were misleading. In general, the fees were collected as the agreement provided. The possibility of at least partial refunds would be expected by a reasonable investor.

Plaintiffs contend that the statement relating to down payments on equipment was misleading because it failed to state that no equipment down payments had been received by SaxonS as of July 31, 1968, and that the balance of the purchase price of the equipment far exceeded the initial investment shown as required initially of a franchisee.

The franchise agreement in use on February 4, 1969, provided that the franchisee had the option of purchasing equipment through SaxonS or independently from a third party. If the purchase was to be through SaxonS, an Agreement for Purchase of Furniture and Equipment was also executed; it required a down payment of $10,000.00 and a lease or sublease was entered into. Plaintiffs' claim that no equipment down payments had been received as of July 31, 1968, was based on Paul Eppenaur's deposition testimony. That testimony was in turn based on a mistaken interpretation of a Touche Ross work paper which Eppenaur corrected in his testimony at trial. Plaintiffs presented no other evidence that equipment deposits were not collected as of July 31, 1968, and no evidence that they were not being collected as of the date of the prospectus.

Although the prospectus does not mention the franchisees' option to purchase the equipment from a third party, we do not believe that this statement as written is misleading. Terms of the option were available to the public because the franchise agreement had been filed as an exhibit to the registration statement.

We fail to see the logic of plaintiffs' claim that the statement was misleading because it failed to disclose that the balance of the purchase price for equipment exceeded by far the total initial investment required of a franchisee. A reasonable investor would assume that an equipment package which required a down payment of $10,000.00 would have a substantial total price. The language ("initial investment") clearly conveys the notion that there would be additional cost to the franchisee. Furthermore, there is no agreement as to the importance of a high versus a low initial franchisee investment. It has been claimed both that a high investment is desirable because a franchisee is thus firmly committed to the venture and, alternatively, that a low initial investment is preferable because the franchisee then has more capital to use as the operation moves along.

Plaintiffs also contend that the statement about lease deposits was misleading because it failed to state that as of July 31, 1968, SaxonS had collected only one $10,000.00 lease deposit and three $5,000.00 deposits. The status of lease deposit collections as of July 31, 1968, does not seem particularly relevant to the statement in the prospectus. No evidence was presented as to the collection of deposits as of February 4, 1969. The statement clearly speaks to the contractual requirements at the time of the prospectus. The omission of the historical data is not significant.

Plaintiffs have also failed to prove that the statements regarding a 3% royalty on gross sales and expenditures for advertising are false or misleading.

The prospectus explained SaxonS' policy for locating new franchises as follows:

SaxonS' policy for expanding its franchise locations is generally to develop a

concentration of units within a specified metropolitan market area rather than to grant franchises on a random basis based solely upon the availability of prospective franchisees and locations.

Plaintiffs claim that this was misleading because SaxonS units were widely spread among several locations and there was no master plan for locating new units. The geographical spread was, of course, apparent from the prospectus itself. Jouras drafted the statement based on West's explanation of SaxonS' policy and House testified that the plan was to concentrate future expansion in metropolitan areas. Plaintiffs presented no evidence tending to show that this was not Topsy's/SaxonS' plan and no evidence that Touche Ross had any knowledge of or responsibility for the allegedly inaccurate statement.

The last paragraph on the SaxonS pages of the prospectus contained capsule financial information: "The total assets and stockholders' equity of SaxonS as of July 31, 1968 were $436,554 and $83,572, respectively. For the year ended July 31, 1968 total revenues and net income of SaxonS were $1,001,640 and $35,572, respectively." Plaintiffs do not allege that this information was false, but rather that it was misleading because of material omissions relating to lease guarantees by Topsy's, contingent liabilities, and an IRS tax deficiency claim for the 1967 tax year. Jouras drafted the paragraph and Herbert Martin, Topsy's controller, supplied the figures. The paragraph does not, of course, constitute a financial statement although the figures for total assets and stockholders equity would appear in a balance sheet and the figures for total revenues and net income would appear in an earnings statement. The items claimed to be material omissions would appear, if at all, in footnotes to a SaxonS financial statement.

With respect to lease guarantees, Berger and Jouras testified that between August 1968 and February 1969, Topsy's had guaranteed payment on some leases entered into by SaxonS because SaxonS did not have sufficient net worth to support its expan-

sion. The SaxonS card file shows that leases were executed for four SaxonS units between August 1, 1968 and February 4, 1969. In the acquisition agreement, Topsy's agreed to attempt to substitute itself as a guarantor for three leases which had been personally guaranteed by West, Sapp, and Henry—namely the pilot unit, the home office, and the Ft. Lauderdale unit. The Ft. Lauderdale unit was subsequently purchased by SaxonS. There is nothing in the record to show whether the other substitutions actually occurred. We are, thus, concerned with lease guarantees by Topsy's of a maximum of six leases, including leases of the pilot unit and the home office. The leases on franchised units were all offset by subleases to franchisees.

The logic of plaintiffs' contention with respect to these lease guarantees escapes us. Although the guarantees could be viewed as contingent liabilities not reflected adequately in the prospectus, the remoteness of the contingency and the fact that plaintiffs have not shown the dollar amounts involved, lead us to conclude that the omission was not significant. If plaintiffs are complaining about the fact there was no revelation that SaxonS was undercapitalized, we would conclude that this was a temporary situation in light of the stated purpose of the debenture issue. There is nothing in the record from which we could infer that Touche Ross had any knowledge of guarantees during the period after July 31, 1968, or had any responsibility for the decision, if such was made, to omit mention of them.

Plaintiffs complain about the failure of the prospectus to disclose that SaxonS had contingent liabilities of $374,000.00 on July 31, 1968, including about $257,000.00 resulting from SaxonS' guarantee of equipment financing for franchisees and about $117,-000.00 on a promissory note payable by the West Palm Beach franchisee.

Franchisees had the option of purchasing equipment through SaxonS or from a third party. If the purchase was through SaxonS, the franchisee could pay cash or finance the equipment through SaxonS. In

that case, SaxonS purchased the equipment from Chakers Ohio Food Fixture Co. and resold it to the franchisee. The franchisee gave SaxonS a promissory note for the balance due and executed a security agreement. SaxonS then assigned the note and security agreement to Chakers with a provision allowing full recourse against SaxonS. Chakers in turn assigned the agreement and note to CIT Corp. Under this arrangement the franchisee was directly liable to CIT and Chakers and SaxonS were contingently liable.

Jouras and Lerner were aware of these contingent liabilities, as was Topsy's management. They did not believe they were material, however, and decided that they need not be mentioned in the prospectus. We agree. The capsule financial information about SaxonS clearly omitted many details, but we find that these omissions were not misleading in a legal sense as contended by plaintiffs.

The SaxonS unit in West Palm Beach was owned by Polynesian Enterprises, Inc., which in turn was owned by Sapp and Henry. Polynesian Enterprises purchased the land on which the unit was located, using a $120,000.00 loan secured by a mortgage on the real estate. In the process of its audit procedures on SaxonS balance sheet as of July 31, 1968, Touche Ross learned that the note had been signed by West, Sapp, and Henry, as well as Polynesian Enterprises, and that SaxonS was the guarantor. Berger knew of this but was unconcerned about the contingent liability because he believed that Henry himself was worth ten times what Topsy's was worth. Ultimately, Topsy's obtained an agreement from Sapp and Henry to indemnify Topsy's and SaxonS against any loss from the note. At the time of the prospectus, the possibility of SaxonS incurring any liability on the note was contingent and remote. Its omission we regard as not material.

Plaintiffs allege that the capsule financial information was misleading because it failed to mention a tax deficiency claim of $45,000.00 against SaxonS. The claim, which involved SaxonS' 1967 tax return, apparently arose during the IRS review in 1968. The review was known about at the time of SaxonS' acquisition by Topsy's and was noted in the unaudited financial statements which were attached to the acquisition agreement and filed with the SEC in September 1968. Berger asked Touche Ross to handle the tax matter. There were several items in the claim, but the bulk of the deficiency was related to SaxonS' deferred recognition of 75% of each franchisee as income until the site was selected. In October 1968, Sharlip learned that the claimed deficiency was $45,303.49, through a telephone conversation with the IRS agent handling the review, and advised Berger of the amount claimed.

An IRS preliminary report was mailed to SaxonS in late December 1968, and forwarded by SaxonS' controller to Touche Ross in Dayton, Ohio. It apparently never reached Sharlip. The final Revenue Agent's Report showing the deficiency claimed was sent to SaxonS on February 12, 1969, and Touche Ross received a copy. SaxonS elected to protest the claim and it was ultimately settled in 1970 through a payment by SaxonS of $34,397.15.

Plaintiffs contend that the IRS assertion of a tax deficiency should have been disclosed because the amount was more than 50% of the stockholders' equity of SaxonS. Most of the deficiency, however, related to taxes on the deferred portion of the franchise fees. Because this deferred portion had not been recognized as income, it would not have been reflected in stockholders equity. Once a site had been selected for a franchise, the deferred portion would have been recognized as income *and* SaxonS would have treated the income tax as payable. The tax liability would have been offset for accounting purposes by the recognition of the franchise fee as income.

In the SaxonS balance sheet as of July 31, 1968, on which Touche Ross expressed its audit opinion, the amount of the IRS claim was treated as a current liability, and the IRS review was explained in a footnote dated February 13, 1969—the date on which Touche Ross had received the final IRS

determination of deficiency. After this, there was only a minor effect on stockholders' equity which resulted from items in the deficiency other than the deferred franchise fees. We find that that amount would have had no material effect on SaxonS' earnings or net worth as of July 31, 1968, and also no material effect on Topsy's financial position as of February 4, 1969. Its omission was not material.

(b) *Audited SaxonS Financials and the "Use of Proceeds" Section.* In addition to the capsule financials on the SaxonS pages of the prospectus, financial information about SaxonS was set forth on page 6. Footnote 5 to the Consolidated Statement of Earnings of Topsy's and its subsidiaries for the year ended July 31, 1968, stated:

> The consolidated statement of earnings does not include the operations of SaxonS purchased subsequent to July 31, 1968 (see Note 11 to Financial Statements). There would be no significant effect on sales, net earnings or net earnings per share if the SaxonS operations were included from the date of organization in January 1967 to July 31, 1968.

The last paragraph on page 6 summarized sales, net earnings, and earnings per share for Topsy's, with a breakout of SaxonS' share, for the four months ended November 30, 1968:

> Sales, net earnings and earnings per share for the four months ended November 30, 1968 were $3,951,819; $251,997; and $.30, respectively, including sales, net earnings and net earnings per share of SaxonS in the amounts of $540,421; $54,567; and $.06, respectively, and for the four months ended November 30, 1967 were $2,586,928; $105,090; and $.14 respectively. These figures are unaudited but in the opinion of management include all adjustments (consisting only of normal recurring accruals) necessary for a fair presentation of the results of such periods.

Plaintiffs have not claimed that this financial data relating to SaxonS was false, but rather that audited financials should have been included. Their contention is that

such audited statements were essentially complete and available and were deliberately omitted, and that Sharlip misrepresented the situation to the SEC.

When the registration statement was filed with the SEC, Topsy's indicated a January 1969 effective date for the offering. On January 10, 1969, Lerner called Touche Ross to say that he had received word that the offering was being held up because of accounting problems. Touche Ross contacted its Washington, D. C., office to see if someone there could obtain a letter of comment from the SEC. On January 17, 1969, Reford Burney of the SEC called Tucker and advised him of several changes that should be made in the prospectus. The most substantial of these was that audited financial statements of SaxonS should be included in the prospectus. This was based on Item 27 of Schedule A of the 1933 Securities Act [15 U.S.C. § 77aa(27)], which provides in essence that if any proceeds of an offering will be used directly or indirectly in the acquisition of a company, a certified profit and loss statement of the acquired company for the three preceding years, together with a certified balance sheet, must be included. Touche Ross understood that the problem arose because the preliminary prospectus stated that "[a]pproximately $600,000 will be added to working capital to replace approximately $200,000 expended in the purchase of SaxonS and $400,000 expended in the purchase of two properties formerly leased to SaxonS."

After conferring on the question, personnel of Topsy's, Tucker Charno, Touche Ross, and Bryan Cave agreed that the registration statement did not come under Item 27 of the Act. On January 21, 1969, a conference call was set up between Clarence Sampson of the Chief Accountants Office of the SEC Division of Corporate Finance and Sharlip, Tucker, Lerner, Herbert Martin, and Wayne McMurtrey (a Touche Ross accountant). Topsy's position was explained to Sampson by Sharlip as follows: Topsy's did not believe that Item 27 applied in that proceeds of the offering would not be used directly or indirectly to purchase SaxonS;

July 31, 1968, just before the acquisition of SaxonS, Topsy's had $150,000.00 in certificates of deposit, plus $450,000.00 in cash, which far exceeded the requirements of the company; and Topsy's was operating in January 1969 without financing or a working capital deficiency. It was the opinion of those speaking with Sampson that the financial statements of SaxonS would not add anything meaningful for readers of the prospectus, because the company had only been in existence since January, 1967 and the operations and assets of SaxonS were small in comparison to the $6,000,000.00 in proceeds to be used to expand it. Sampson was told that SaxonS was not a 15% significant subsidiary considering sales, net earnings, assets, or equity, and that the narrative portion of the prospectus accurately set forth those figures for SaxonS. It was indicated that timing was important and that audited financials for SaxonS were not available.

Sampson suggested that a wording change in the Use of Proceeds section and a letter supporting the change would clear up the problem. He made some calculations and agreed that SaxonS would not have a material effect, but suggested adding a footnote to the summary of earnings indicating the subsequent acquisition and stating that it would not materially affect the summary. He also requested updated financial information.

As a result of the conversation, Jouras made revisions in the prospectus. In the Use of Proceeds section, the reference to proceeds being used to replace working capital expended in the acquisition of SaxonS and the purchase of two formerly-leased properties was deleted. Berger and House agreed that this change was appropriate because Topsy's did not need nor did it intend to use the proceeds to replace those amounts spent. Jouras added a footnote to the Capital Structure section to reflect an additional $550,000.00 in short-term bank loans. This included a short term bank loan of $400,000.00 that had been obtained in conjunction with the purchase of the Ft. Lauderdale and Waco properties. Note (5) was also added to the Consolidated State-

ment of Earnings to point out that the audited financial statements did not include SaxonS' operations.

A paragraph was also added to page 6 of the prospectus to show the unaudited sales, net earnings, and earnings per share of Topsy's, including SaxonS, for the four months ended November 30, 1968, and the unaudited sales, net earnings, and earnings per share of SaxonS for the same four months. Also included were figures for Topsy's for the same four-month period of 1967. This information was obtained by Jouras from Topsy's controller.

The letter which Sampson had requested was drafted by Jouras, with information from Martin, and revised by Tucker. It was signed by House and presented the following facts in support of Topsy's position that the proceeds were not being used to acquire SaxonS:

1. The Company's net working capital at July 31, 1968, immediately prior to the purchase of SaxonS, was $375,591.

2. Current assets included $569,381 in cash, significantly greater than the cash balance necessary for the Company's operations. This amount included $150,000 in certificates of deposit.

3. The cash required for the purchase of SaxonS was met by the redemption of the certificates of deposit and payment from the Company's available cash balances.

4. As of December 31, 1968, the Company had advanced over $500,000 to SaxonS for the acquisition of sites. In addition to these advances, the Company has invested over $400,000 in expansion of its own operation of snack bars and popcorn concessions. Of this total of more than $900,000, the Company has borrowed only $550,000 in short term bank notes to meet the expansion requirements of both SaxonS and the Company.

5. The Company's operations have continued to be profitable and have provided added working capital from

earnings. The Company has met all current obligations, including the timely payment of federal and state income taxes, and as of this date, the Company continues to maintain a positive net working capital position.

Plaintiffs argue that the Use of Proceeds section contained a misrepresentation because the proceeds were in fact used for the purchase of SaxonS. The offering closed on February 11, 1969, and a part of the proceeds was deposited in Topsy's regular bank account in Kansas City. On February 12, 1969, the account was debited $402,980.56 as a payoff to the bank's loan department of the $400,000.00 loan obtained in connection with the purchase of the Ft. Lauderdale and Waco properties. Without the proceeds, the Topsy's account was not sufficient to make that payment. At the time the revised Use of Proceeds section was submitted to the SEC, Topsy's intended to pay off the loan with part of the proceeds.

Plaintiffs' reasoning is apparently as follows: (1) The acquisition of SaxonS included the purchase of the Waco and Ft. Lauderdale properties; (2) Topsy's told the SEC that proceeds would not be used for the acquisition of SaxonS, either directly or indirectly; (3) Repayment of the $400,000.00 bank loan was using the proceeds indirectly for the purchases of the Waco and Ft. Lauderdale properties, and hence for the acquisition of SaxonS; (4) Therefore, the Use of Proceeds section was a misrepresentation. We have come to essentially the same conclusion, but have reasoned differently. The preliminary prospectus stated that part of the proceeds would be used to replace working capital expended in the purchase of the Waco and Ft. Lauderdale properties. The final prospectus changed the Use of Proceeds section, and thus implied that the proceeds would not be used as stated in the preliminary prospectus, that is, would not be used for the Waco and Ft. Lauderdale properties. But in fact, part of the proceeds was used indirectly for purchase of the Waco and Ft. Lauderdale properties. This use was intended by Topsy's when the final prospectus was issued. The

Use of Proceeds section of the final prospectus was misleading. Responsibility for this rests with Topsy's management. Although Sharlip and McMurtry were present when the conference call was made to the SEC, and Sharlip apparently presented Topsy's position to the SEC, there is no evidence from which the court can reasonably infer that anyone from Touche Ross was aware that Topsy's intended to use the proceeds to pay off the bank loan. Our concern is, of course, with misrepresentations or misleading statements made to the public. Misrepresentations made to the SEC are not in themselves actionable, but are relevant in that they may reveal the intent of the parties. During the conference call, Sampson was told that Topsy's cash far exceeded its needs as of July 31, 1968. Plaintiffs argue that this was not true, and point to the fact that a Touche Ross work paper shows that Topsy's had a deficit balance of $20,793.00 in its "regular" account as of that date. Plaintiffs have not, however, shown that cash for the acquisition was not available in other accounts and certificates of deposit, or that the outlay of the $203,915.00 acquisition price was not easily absorbed by Topsy's.

Sampson was also told that audited financials were not available. Plaintiffs argue that this was false. We find, however, that while much of the work necessary for preparation of audited statements and the issuance of an accountant's opinion had been accomplished, it was by no means complete. There is no direct evidence as to when audited financials for the year ended July 31, 1968, could have been completed by Touche Ross had they attempted to finish them when the comments from the SEC were made. Eppenauer testified, however, that had an audit of SaxonS been commenced when he was in Columbus in September, it could have been completed in four to five weeks. At any rate, some delay would have been inevitable. In addition, the SEC request included audited profit and loss statements for the period before the year ended July 31, 1968. To have accomplished that, Touche Ross would have

had to perform considerable additional audit procedures for the prior period.

In addition to the Item 27 requirement, the SEC apparently requires audited financials of an acquired subsidiary if it is a "material" acquisition. In determining whether an acquisition is material, the SEC used a "15% significant subsidiary test." Sampson was told during the conference call that SaxonS did not meet the subsidiary test. If total assets, sales, and stockholders' equity figures as of July 31, 1968, are compared, SaxonS constituted less than 15% of Topsy's. If, however, interim earnings for the four months ended November 30, 1968, are compared, SaxonS' net earnings were greater than 15% of the net earnings of Topsy's on a consolidated basis. Sampson had all of these figures before him because they appeared in the preliminary prospectus, and he made his own calculations. He came to the conclusion that SaxonS did not meet the significant subsidiary test. It seems quite reasonable to have used figures at the time of the acquisition rather than four months later, in determining whether an acquisition was "material."

Plaintiffs contend that two other statements within the Use of Proceeds section were false or misleading: "The Company estimates that approximately $200,000 is required for completion of each unit, including acquisition of site and construction and equipping of building. The Company presently anticipates the addition of approximately fifty SaxonS units to be owned by the Company and either operated by it or leased to franchisees." With respect to the $200,000.00, plaintiffs argue that this was an unreasonably low figure and known to be so, because three Kansas City sites had been purchased in November, December, and January for $109,000.00, $135,000.00, and $243,455.00, respectively. The last of these, however, was larger than needed and part was resold leaving a net cost of $150,000.00 for the unit site. House testified that the words "equipping the building" referred to air conditioning and heating systems, which were the responsibility of SaxonS, rather than restaurant equipment, which was the franchisee's responsibility.

We are not convinced that the estimate was so unreasonable at the time it was made that it was misleading, or that it was made in bad faith. Even if it had been, Touche Ross had no responsibility for it. It would have made no significant difference to prospective investors if the prospectus had said that the cost to complete a unit was $250,000.00 rather than $200,000.00.

With respect to the anticipation of fifty units, House testified that as of November 1, 1968, Topsy's plans were for fifty additional units. Plaintiffs have not refuted this testimony and have not shown that this was not the plan at the time of the prospectus.

(c) *The "Management and Principal Stockholders" Section of the Prospectus.* The prospectus shows that William West was a director of Topsy's and president of SaxonS Sandwich ShoppeS, Inc. Plaintiffs claim that the statement was misleading, because there was no disclosure that Topsy's management was dissatisfied with West, had been seeking new management for SaxonS, and intended to fire West. Although there is some question about whether this claim was abandoned by plaintiffs by way of the statement in their brief on appeal to the Tenth Circuit that "Mr. West's firing is no longer an allegation in the Complaint," we have elected to deem it still viable and we will consider its substance briefly.

Earlier we discussed Topsy's dissatisfaction with West. On February 3, 1969, Berger placed an anonymous ad in the *Wall Street Journal* seeking a president for SaxonS. The ad described the position as follows:

PRESIDENT
Our Franchise Division
(Fast Food)
Needs a Dynamic Experienced
Proven Successful Executive

Berger testified that he did not intend to fire West, but rather intended to hire a new president and make West chairman of the SaxonS board of directors. The president

would report to West, and the situation would be similar to that of Topsy's where House was president and Berger, chairman of the board. Other Topsy's personnel and Jouras, who drafted this section of the prospectus, were unaware of Berger's plans. Nor did Berger discuss the plans with Touche Ross. We find that Berger's explanation is plausible. A prospectus cannot tell everything about a company. Such matters as changes in management positions and responsibilities are normally to be expected. Clearly, expansion with a $6 million debenture issue would alert an investor to the possibility of additional personnel and a shifting of responsibilities of present management. It is, however, true that House and West agreed that West should resign on February 14 or 15, 1969. House testified that West wanted full control of the debenture proceeds, and that was unacceptable to management. Manzione resigned shortly thereafter.

This particular section of the prospectus also sets forth the aggregate direct remuneration paid by Topsy's to certain officers and directors during the fiscal year ended July 31, 1968, as follows:

| | | |
|---|---|---|
| Jerry D. Berger | Chairman-Board of Directors-Director | $ 36,400.00 |
| James T. House | President-Director | $ 35,100.00 |
| All Officers & Directors as a Group (12 persons) | | $159,877.00 |

Plaintiffs do not claim that this statement is false, but rather that it is misleading because, at a meeting of Topsy's board on July 19, 1968, salary increases were authorized for the year beginning August 1, 1968. Berger's salary was raised to $50,000, House's to $45,000.00.

Shortly after the prospectus became effective, Lerner reviewed the minutes of Topsy's board meetings and noted that the 1968 salaries had been increased. He brought this to the attention of Tucker and Jouras. Tucker told Berger that the salary increases should be rescinded. A special board meeting was held on February 11, 1969, and the board adopted a resolution rescinding the increases. It is not clear from the record how the rescissions were handled, but it appears likely that the excess salary amounts were charged to drawing accounts. At a special meeting of the board on July 18, 1969, the board authorized bonuses to Berger and House of $13,600.00 and $9,900.00 respectively. The bonuses represented the differences between the salaries received by Berger and House, and the increased salaries that had been approved and then rescinded.

We do not believe the salaries statement in the prospectus was misleading. It specifically spoke to salaries for the fiscal year ended July 31, 1968. A reasonable investor would quite likely assume that salaries would be increased for the following year. Touche Ross had no responsibility for the failure of the prospectus to describe salaries for the fiscal year beginning August 1, 1969. It would not have been expected to note this, because its concern was with statements in the narrative portion of the prospectus which might be in conflict with the audited financials. The accountants' report did not cover the post-July 31, 1968 period, except for significant subsequent events. Salary increases would not have been so classified.

(d) *The "Transactions with Management" Section of the Prospectus.* Plaintiffs claim that this section was misleading because it did not state that Topsy's had guaranteed a $25,000.00 bank loan, which West had received. After approving the acquisition of SaxonS at the board meeting of August 22, 1968, the board authorized Berger to co-sign or guarantee bank loans to West up to $25,000.00. Berger recommended this action because West had financial problems resulting from the decision that West would receive stock in lieu of cash for the acquisition, and would have to pay income taxes on the stock received. Topsy's did guarantee a $25,000.00 loan.

We do not believe the omission from this section of the prospectus was material. Further, the loan guarantee would not have been appropriately included in the certified financials portion of the prospectus because it was not a significant subsequent event.

D. *From the Closing of the Offering Through August 1, 1969.* February 11,

1969, was set as the closing date for the offering by the terms of the Underwriting Agreement and the final prospectus. Topsy's and the selling shareholders presented the $6 million in debentures and 104,796 shares of Class A Common Stock to the underwriters and received the net proceeds: $5,760,000.00 to Topsy's and $2,728,888.00 to Berger, House, and Nuell. Pursuant to the Underwriting Agreement, Berger and House certified on behalf of Topsy's that the representations made by Topsy's in the Agreement were true and correct, that they had carefully examined the registration statement and prospectus, and that the registration statement and prospectus contained no material misstatements or omissions. As selling shareholders, Berger, House, and Nuell certified that all of their representations in the Agreement were true and correct and that they had satisfied all conditions that were required of them.

On behalf of Bryan Cave, Lerner submitted a written opinion to the underwriters regarding the legal sufficiency of the offering and stating that the registration statement and prospectus complied as to form with the Securities Act of 1933 and SEC regulations. Negative assurance that no facts had come to Bryan Cave's attention, which led it to believe that the registration statement or the prospectus contained any material misrepresentations or omissions, was also given. Jouras, on behalf of Tucker Charno, submitted a similar opinion.

On February 11, 1969, Touche Ross, at the request of Topsy's, submitted a "cold comfort" letter to the underwriters. The letter gave negative assurance to the underwriters with respect to certain events since the audit date. The letter itself described the limited nature of the assurance and the procedures utilized in forming a basis for the assurance.

In the letter, Touche Ross expressed its opinion that the audited financial statements of the registration statement and prospectus complied as to form with the Securities Act and SEC regulations. Touche Ross stated that it had not conducted an audit on financial statements subsequent to July 31, 1968, and did not express an opinion on the unaudited earnings for the four months ended November 30, 1968, or on the operations as of any date or period after July 31, 1968. Touche Ross did acknowledge that it had made a review with respect to the period from July 31, 1968 to February 4, 1969, which was limited to three procedures:

1. Read the unaudited consolidated financial statements of the Company and its subsidiaries covering the four-month periods ended November 30, 1968 and 1967, officers of the Company having advised us that no such financial statements as of any date or for any period subsequent to November 30, 1968 were available.

2. Read the minutes of the meetings of the stockholders and the Boards of Directors of the Company and its subsidiaries as set forth in the minute books at February 4, 1969, officers of the Company having advised us that the minutes of all such meetings through that date were set forth therein; and

3. Made inquiries of certain officers of the Company and its subsidiaries who have responsibility for financial and accounting matters, as to whether since January 15, 1969 there had been any change in the consolidated capital stock or long-term debt of the companies from that shown as of January 15, 1969 under the caption "Capital Structure" in the Prospectus, and as to whether since July 31, 1968 there has been any material adverse change in the consolidated financial position or consolidated results of operations.

Emphasizing that these procedures did not constitute an audit, Touche Ross gave negative assurance that nothing had come to its attention that would indicate that the unaudited financial statements of Topsy's and its subsidiaries for the four months ended November 30, 1967 and 1968 had not been prepared in accordance with generally accepted accounting principles, or that

there had been any change in the capital stock or financial debt of Topsy's on a consolidated basis from January 15, 1969 to February 4, 1969, or that there had been any material adverse change in the consolidated financial position of Topsy's and its subsidiaries since July 31, 1968, except as set forth in the registration statement.

1. *Kansas City Star Article, February 23, 1969.* This news story stated that construction was about to begin on three SaxonS units in Kansas City, which were expected to open about June 1. House was quoted as having stated that the company had five additional locations under option awaiting zoning approval, and that "SaxonS units are in operation or under construction in Alabama, Arizona, Florida, Georgia, Michigan, North Carolina, and Ohio, in addition to Kansas and Missouri." Plaintiffs claim that the last statement was misleading because SaxonS did not have any shops in operation or under construction in Alabama, Georgia, or North Carolina. House testified that SaxonS franchises had been sold in those states, but that construction had not yet begun. The SaxonS card file, however, shows franchises sold in Georgia but not in Alabama or North Carolina. We believe that the statement was a misrepresentation, but that it was not material. The article was based on a press release issued by Topsy's and does show the carelessness of Topsy's management in making public statements. Touche Ross was in no way implicated.

2. *Quarterly Report to Shareholders, March 19, 1969.* This report, in letter form, was prepared by Tucker and signed by House. It enclosed a dividend of 2½ cents per share and included a report on the unaudited results of Topsy's operation for the quarter ended January 31, 1969. It told of the successful offering of the debentures and stated that "[w]ith these funds, the Company [Topsy's] will be able to expand and develop all phases of its business." This last statement was inconsistent with the prospectus, which said that proceeds would be used "to finance the acquisition, construction, and development of sites for SaxonS Sandwich ShoppeS."

Tucker and House discussed the statement before House signed the letter. House did not recall why the statement was made, or what was intended by it. He testified that as of the date of the prospectus, Topsy's intended to use the proceeds as stated in the prospectus and did so use them. This appears to be another example of the casual approach of Topsy's management to public statements. There is insufficient evidence to sustain any conclusion about the statement. Apart from the statement in the report, the record does not show what Topsy's intent was at the time. Plaintiffs have not proved that the statement constitutes a material misrepresentation.

3. *Kansas City Times Article, March 20, 1969.* Ben Schifman's column contained a report on the March 19 letter to shareholders and stated: "The results for the latest period included the operations of SaxonS Sandwich ShoppeS, Inc., a wholly owned subsidiary acquired last August, and contributed to the 51 percent gain in sales and the 80 percent rise in profits over the year earlier statement." Plaintiffs claim that the article was misleading because it omitted the fact that SaxonS had incurred losses in two of the three months of the second quarter. The evidence does show that SaxonS suffered a net loss of $22,682.72 in December 1968. The statement relating to SaxonS in the article, however, is more confusing than misleading. Furthermore, Touche Ross had no connection with or responsibility for the article.

4. *G. H. Walker Research Notes, April 11, 1969.* This report contained the following statements:

> During the current fiscal year the Topsy's primary business, leased snack departments, is performing very well chiefly because of a 33% price rise on beverages last summer and the many new profitable locations opened in the last year. However, the construction of new SaxonS units has been somewhat slower than hoped for earlier because it is taking longer to find and develop suitable loca-

tions. This is an important factor affecting this year's reported earnings estimate because the time at which the profit on the sale of equipment and the initial franchise fee of a new SaxonS' franchise are taken into earnings depends on the exact scheduling of the construction at the close of the fiscal year on July 31. Management still expects to place 50 units in operation by the end of the building season in this calendar year. Topsy's strong cash position will place it in a good competitive position in finding sites in this period of tight money. There were nine SaxonS units open at the time of the acquisition last August and within the next month there will be 21. While it is too early to fully evaluate SaxonS' outlook, it remains promising.

The company is actively interested in further acquisitions or mergers in the food service field. After a rapid rise earlier this year the stock has come down recently. Purchase is recommended.

Plaintiffs claim that the report was misleading because it failed to state that SaxonS had sold only five franchises and refunded several franchisees during the prior six months, and because there was no reasonable expectation that fifty units would be in operation by the end of the building season. The SaxonS card file shows that eight franchises had been sold between October 11, 1968 and April 11, 1969. The research report does not purport to describe the number of franchises sold. The card file shows that five franchise fees had been refunded in the six-month period, but we are not convinced that this was a particularly significant omission in itself. The limited sales of franchises, the refunds, and other events (the Manzione and West resignations, for example) lead us to conclude, however, that the expectation of fifty units in operation was unrealistic, and known to be so by Topsy's management.

The report was based on a series of conversations William Gill had with Berger and House. It appears to be another example of carelessness on the part of Topsy's management. There is no indication that Touche Ross had anything to do with the

report, and it certainly had no duty to monitor Topsy's communications with Gill.

5. *Quarterly Report to Shareholders, June 20, 1969.* The report, in letter form, described Topsy's net sales and net earnings for the quarter ended April 30, 1969, as $3,073,849.00 and $78,250.00 respectively. Herbert Martin, Topsy's controller, testified that when he initially drafted the financial statement it showed $150,000.00 less in pretax profits and a net loss for the quarter. He testified further that when he showed the statement to Berger, Berger told him that SaxonS had received $150,000.00 in pre-tax income not reflected in the statement, which resulted from the sale of three SaxonS franchises, each with a $50,000.00 franchise fee. According to Martin, he questioned the transaction, but was assured by Berger and Tucker that the franchise agreements had been signed and were in Tucker's office. Berger denied this. We find Martin's description of these events to be credible. The inclusion of $150,000.00 in unsupported earnings in the letter to shareholders was a misrepresentation, and was the result of intentional false statements blatantly made by Berger and Tucker. There is no indication that Touche Ross had anything to do with this situation, however.

The letter to shareholders also reported that there were thirty-one SaxonS units "in various stages of development." Although plaintiffs claim that thirty-one units were not in "development" at that time, they offered no evidence as to the number of units that were. The language is broad and the term "development" is so ambiguous that we cannot make a determination that the statement was materially misleading.

6. *The New Franchise Agreement.* In the Spring of 1969 a new form of franchise agreement was put into effect. It was based on a franchise agreement used by International Industries, Inc. and had been brought to the attention of Topsy's by David Rapoport, a senior vice president of International. Rapoport was later hired as president of SaxonS and assumed his duties about August 1, 1969. The new agreement

was for a fifteen-year term. It provided for an initial franchise fee of $25,000.00 as a non-refundable front-end payment. In accordance with generally accepted accounting principles, the entire $25,000.00 was to be taken into income upon the establishment of the franchise relationship.

Topsy's conferred with Touche Ross about the accounting treatment of fees and of equipment leased under the agreement. It was decided that under Accounting Board Principle Opinion No. 7, the total of the fifteen-year equipment lease payments (discounted to present value), less the cost of equipment, would be taken into operations at the time the unit was opened. One of the purposes of the new agreement was to bolster the earnings of SaxonS.

7. *The Poulos Transactions.* Nicholas Poulos had been an employee of Topsy's since 1960. In early 1969 he had been assistant to the president of SaxonS, and in March or April he became director of operations of SaxonS, replacing Manzione. Poulos reportedly purchased two SaxonS franchises in Columbus and Whitehall, Ohio. The agreement for the Columbus unit was dated April 15, 1969; the agreement for the Whitehall unit was dated July 15, 1969. The agreements were not executed until August 1969, even though they were backdated to fiscal 1969. Poulos paid for the franchises by giving SaxonS a promissory note for $20,000.00 and $30,000.00 cash obtained through a loan from Topsy's bank in Kansas City. Poulos pledged $30,000.00 of Topsy's stock to secure the loan and the promissory note given to the bank was personally guaranteed by House. Berger signed an indemnification agreement assuring Poulos that he would not lose any money on the transaction.

Some time in fiscal 1970, the units were sold or franchised to someone else. Topsy's either paid off the bank or returned the money to Poulos so that he could pay the bank. This transaction was another attempt to bolster SaxonS' earnings during this particular period. Topsy's management was increasingly concerned about poor results from SaxonS.

8. *The Gottleib Transaction.* Arvin Gottleib was a personal friend of Berger who had acted as the real estate agent in locating the first site for SaxonS in Kansas City. He entered into an agreement, dated July 29, 1969, to purchase a franchise for the unit located at 36th and Broadway in Kansas City, Missouri. The unit was opened in late July 1969. SaxonS received payment for the franchise on August 22, 1969. SaxonS ran the unit for Gottleib's account under a special arrangement between SaxonS and Gottleib, and the revenues and expenses of the unit for the last few days of July were allocated to Gottleib's account and were not included in Topsy's 1969 consolidated financial statement. The Gottleib transaction, however, accounted for approximately $40,000.00 to $45,-000.00 after-tax profit out of Topsy's total after-tax earnings of approximately $370,-000.00 for fiscal 1969.

Like the Poulos transaction, the Gottleib sale was an effort to buttress earnings for 1969. A section of Ben Schifman's column in the *Kansas City Times* of June 20, 1969, was headed "Topsy's Profits Up," and began "Sharply higher sales and profits were reported by Topsy's International, Inc., for the third quarter and nine months ended April 30, compared with a year earlier."

E. *After August 1, 1969.*

1. *The Settlement with West.* In August 1969, Topsy's entered into an agreement with West to repurchase, as treasury stock, the stock West had received through the acquisition of SaxonS. The agreement, dated August 22, 1969, provided that $111,-314.25 would be paid to West, and West would repay Topsy's $31,314.25, which had been advanced to West and was a receivable due SaxonS. The payments were actually made prior to the date of the agreement: $80,000.00 on August 6, 1969, and $31,314.25 on August 15, 1969.

2. *Repurchase of the Debentures.* Beginning, in August 1969, Topsy's began to repurchase its debentures. Between August 5 and September 24, 1969, Topsy's paid $277,406.83 to repurchase debentures having a face value of $394,000.00. Berger

testified that Topsy's was not required by the indenture to repurchase the debentures but made the decision because they were cheap. He indicated that Tucker and Touche Ross recommended the repurchase and that Topsy's management believed that it was in the best interests of the shareholders. The result was a realization of immediate earnings from the reduction of debt. For the first quarter of fiscal 1970, this amounted to $47,000.00.

3. *Securing Advances to SaxonS.* On October 24, 1969, Eppenaur and Robert Miller (the Touche Ross manager on the Topsy's engagement for the 1969 audit), Berger, Tucker, Jouras, and Bob Farmer (then SaxonS' house counsel), met to discuss matters relating to SaxonS. Miller described the meeting as called by Berger, Jouras, Tucker, and Farmer to discuss the insulation of Topsy's from SaxonS and possible lawsuits against SaxonS. Berger noted the meeting on his calendar in different terms: "How to handle all pull out of assets from SaxonS[.] Lawyers, etc." Berger testified, however, that the meeting was called because it had come to Topsy's attention that advances made to SaxonS by Topsy's for the purchase of property had not been secured by mortgages. Topsy's intention apparently was to back up and take security interests in the properties. Touche Ross advised that correcting entries could be made in the books but that the original transactions would be there for anyone who wanted to see them. Berger, Tucker, Jouras, and Farmer discussed several lawsuits and possible lawsuits against SaxonS corporations from landlords or franchisees. Tucker indicated that he was concerned about suits by franchisees but less so about suits by landlords.

4. *The 1969 Audit and Annual Report.* Touche Ross performed an audit of Topsy's and its subsidiaries as of August 2, 1969, and expressed its unqualified opinion, dated November 14, 1969, on Topsy's consolidated financial statements for fiscal 1969. Sharlip was the partner in charge of the 1969 audit and Miller, Eppenaur, and others worked with him. The consolidated financial statements were first published in the

Annual Report issued on November 26, 1969. Tucker drafted the Message from Management section of the report based on information obtained from Berger and House.

The Message from Management reported an increase in revenues from $8,256,000.00 to $11,823,000.00 but a decrease in earnings from $399,000.00 to $370,000.00 and stated:

> The lower earnings were due largely to the increase in expenses in developing the SaxonS franchise package and lower than estimated revenues in the SaxonS division, due to tight money and labor stoppages. Earnings for the nine months was previously reported at $439,000.00. Since then two SaxonS franchise agreements were repurchased, causing a reduction in income. These franchises were resold in October.

It was also reported that there were twenty SaxonS units in operation and three more expected to open within the next quarter. A temporary slowing of plans for SaxonS was attributed to the extremely high cost of money. The Message from Management section ended on a positive note: "Your company is on a sound financial basis and looking forward to continued growth."

The Message from Management did not explain SaxonS' operating difficulties as a reason for declining earnings. Eppenaur's 1969 audit memorandum summarized the year's activities of SaxonS as follows:

> During the past year much money and effort on the part of management was spent on the following:
>
> 1. Redesign of building: making it smaller and less costly to build.
>
> 2. Negotiating with unhappy franchisees.
>
> 3. Operating units taken over.
>
> 4. Developing a new franchise agreement.
>
> 5. Finding new and capable management.
>
> The result of all this has been an unprofitable year coupled with an uncertain future. Management has scaled down ex-

pansion due to the tight money market and uncertain nature of the "fast food industry". During this breathing period they intend to pay more attention to current operations, negotiate settlements with franchisees and landlords on unprofitable bad locations, and generally "clean house". Management contends that units which are unprofitable as a sandwich shop can be turned around by changing the menu to include hamburgers, etc. A menu change has recently been implemented in some shops. However, it is still too soon to see what effect this has on overall volume and profits.

It is clear that Topsy's was re-evaluating its expansion plans for SaxonS in light of the operating problems SaxonS was experiencing. Rapoport, who came on as SaxonS' president in August 1969, wanted to concentrate on SaxonS in the Kansas City area and close scattered units like Waco, in order to make more effective use of television advertising. Although it appears that Berger may have intended for Topsy's to pull out of SaxonS altogether, he did not communicate his intentions widely. Martin, who left Topsy's in October 1969, was unaware of any decision to discontinue the SaxonS' operation. As Eppenaur's memorandum shows, he was not aware of a decision to cease expansion. Under the circumstances, we fail to see that Touche Ross had any responsibility to monitor the Message from Management section of the annual report.

Plaintiffs complain that the financial statements in the Annual Report were misleading because the goodwill of SaxonS on the consolidated balance sheet should have been written off. The goodwill was the excess of the purchase price of SaxonS over the net assets of SaxonS at the acquisition date. In the course of the audit, Touche Ross challenged the carrying of the goodwill because of concern with SaxonS operations. At the October 24, 1969 meeting, Robert Miller reminded Berger and the others present that Touche Ross was still waiting for them to justify retaining the goodwill intangible. Miller had discussions with Berger and Rapoport. Management represented that they had definite plans for SaxonS including the changing of the design and menu, that SaxonS was young and the concept was viable, and that they intended to test the profitability of multi-location operations in Kansas City. Eppenaur's audit memorandum reflects the same expressed intentions of management:

> During this breathing period they intend to pay more attention to current operations, negotiate settlements with franchisees and landlords on unprofitable bad locations, and generally "clean house". Management contends that units which are unprofitable as a sandwich shop, can be turned around by changing the menu to include hamburgers, etc. The menu change has recently been implemented in some shops. However, it is still too soon to see what effect this has on overall volume and profits.

The goodwill intangible undoubtedly would have been written off had management expressed an intent to liquidate or terminate SaxonS. In the face of management representations that SaxonS was viable and that its problems could be corrected, Touche Ross would have had to conclude that the goodwill had become worthless in order to overrule management. It had not become "reasonably evident" that the intangible had become worthless, therefore, Touche Ross' inclusion of the goodwill was in accordance with generally accepted accounting principles.

During the 1969 audit, Touche Ross became concerned about the Poulos transactions. Topsy's wanted the transactions included in the reported earnings. Touche Ross believed that they should not be recognized or reported as income producing transactions because Poulos had been wholly financed and indemnified by Topsy's and Berger and was not truly at risk. Touche Ross' position prevailed and earnings from the transaction were not included in reported earnings.

The Message from Management section of the Annual Report spoke of the repurchase of two franchise agreements "causing

a reduction of earnings." These were the Poulos franchises. Topsy's had reported net income of $439,300.00 for the first three quarters of fiscal 1969. Without the Poulos earnings, there was a loss in the fourth quarter. As a result, net earnings for the whole year were lower than reported for the first three quarters.

The position that Touche Ross took with respect to these transactions was fully in accord with generally accepted accounting principles. The transactions were irrelevant to the audited financials and no mention of this situation would have been expected in the financials. Touche Ross had no duty to monitor the Message from Management section or to make any determination that the transactions should have been explained therein.

As we indicated above, the Gottleib transaction straddled the year end; the cash was not deposited until late August, but the contract was dated July 31, 1969. Touche Ross challenged the transaction and had three questions: (1) Whether the transaction was valid; (2) How the transaction should be recorded; and (3) Whether it should be recorded in fiscal 1969 or fiscal 1970.

Touche Ross concluded that the transaction was valid because the unit was open and operating; there was a signed contract; Gottleib paid money, was at risk, and was financially well off; and Gottleib was not a Topsy's employee and was not indemnified.

Because no part of the franchise fee was refundable, the entire $25,000.00 was taken immediately into income as of the date of the agreement in accordance with generally accepted accounting principles. The equipment lease was accounted for as a sale in accordance with the "financing method" described in Accounting Principles Board Opinion No. 7. The amount to be paid over the fifteen-year lease was aggregated and discounted to present value, using the appropriate interest rate. The result was that the selling price was to be taken into revenue. The cost of the equipment was charged to cost of goods sold. The imputed interest would be taken into income over the period of the lease. Expert testimony supported this accounting for the franchise fees and equipment leases.

With respect to whether the transactions should have been recorded in fiscal 1969 or 1970, Touche Ross concluded that it could properly be treated as a fiscal 1969 transaction. They were persuaded by the agreement itself, the fact that the unit was operating prior to the year end, and by management's representations that the substance of the agreement had been reached in fiscal 1969. The treatment was in accordance with generally accepted accounting principles. The accounting profession's standards imposed no duty on Touche Ross to make any additional disclosures relating to the Gottleib transaction.

5. *Quarterly Report to Shareholders, November 28, 1969.* This report showed revenues, net earnings, and earnings per share for the twelve weeks ended October 25, 1969, as $2,842,000.00, $208,000.00, and 23 cents respectively. It also contained the following statement: "Included in the 1969 earnings is non-recurring income, net of income taxes, of $47,000.00 (5 cents per share)." Ben Schifman's column in the *Kansas City Times* of December 2, 1969, contained a summary of the report and also described $47,000.00 as non-recurring income. Plaintiffs claim that the report and article were misleading because they did not state that the non-recurring income resulted from Topsy's repurchase of some debentures. Despite the fact that Touche Ross had discussed the repurchases with Topsy's, it had no responsibility for statements made by Topsy's management in the quarterly report, and no responsibility for the summary of the report that appeared in the *Kansas City Times.* Touche Ross' knowledge gave rise to no duty to review or explain these items.

6. *Annual Meeting of Shareholders.* The annual meeting was held on December 10, 1969, at Topsy's offices. Twenty to twenty-five shareholders and all the officers and directors, except G. Kenneth Baum, were present. Robert Miller also attended, and Touche Ross was appointed

independent public accountants for the coming year. Berger told those present that the reduction in earnings per share in the fourth quarter was a direct result of Touche Ross' insistence that fees and gains on equipment sales for two franchises not be applicable to the year ended August 2, 1969, thereby forcing the company to record them in the first quarter of fiscal 1970. The two franchises were those in the Poulos transactions. Miller made no comment. It is clear that earnings declined in the fourth quarter of fiscal 1969 and that the Poulos transactions were merely an attempt by Topsy's management to artificially inflate them. Berger's maneuverings and less than candid statements at the shareholders' meeting are examples of his indifference to the truth.

Berger also told the shareholders that Topsy's had decided to defer expansion of SaxonS, because they were unable to get reasonable financing for the twenty-five units that "had been programed for installation in the coming year." He stated further that built-in overhead expenses for the SaxonS franchise operations would be a drain on profits in fiscal 1970.

7. *Quarterly Report to Shareholders, March 6, 1970.* This letter showed the following results for the twelve weeks ended January 17, 1970:

| | |
|---|---|
| Revenues | $2,926,000 |
| Net Earnings (Loss) | (20,000) |
| Earnings (Loss) per share | (2 cents) |

The letter stated in part:

> Results for the quarter ended January 17, 1970, include charges made to reflect the repurchase of three SaxonS franchised units. The sale of one of these units was reported in the last quarter of fiscal 1969; sales of the other two units were included in the first quarter of this fiscal year. The effect of these repurchases was a reduction of second quarter earnings in the amount of $292,000, which had been included in earnings of prior periods.

> .    .    .    .    .

> The Company is pursuing a policy of reacquiring certain of its franchised units. If additional units are repurchased, sub-

sequent charges for earnings reported in previous quarters will be required.

From the letter it seems clear that a decision not to expand SaxonS had been made.

On March 19, 1970, Berger, House, Rapoport, Farmer, and Tucker met with two Kansas City attorneys in order to determine "[h]ow to terminate SSS [SaxonS] quickly, preserving for Topsy's its security represented by real estate mortgages, and securing interests in equipment, and at the same time exposing Topsy's as little as possible to litigation and unfavorable publicity." As a result of the meeting, Rapoport went into the field seeking to cancel or terminate franchises, and representing to franchisees that SaxonS had not been able to provide the help or assistance contemplated by the franchise agreements. Along with cancellations, he attempted to obtain releases running to SaxonS and Topsy's. His presentation to franchisees was basically "Look, we won't do anything for you or to you, and you agree to do the same for us. You operate, buy your own supplies, do your own advertising, pay your own rent to the landlord, and we will stay out of it, and you have no obligation to us; we have none to you."

There is no evidence that Touche Ross was aware at the time of these activities. The memorandum by Eppenaur dated September 2, 1970, on the history and status of SaxonS stated:

> Immediately subsequent to August 2, 1969, and after opening five new SaxonS's shops which had been under construction as of August 2, 1969, management decided to scale down expansion due to the tight money market and the uncertain nature of the "fast food industry". During this "breathing" period, management intended to give closer attention to current operations, negotiate settlements with franchisees and landlords on unprofitable locations and generally "clean house". Management felt that some of the units which were unprofitable as a pure sandwich shop, could be turned around by changing the menu to include hamburgers, etc. However, it

soon became evident that the probability of turning SaxonS into a profitable operation was slim, thus management decided to buy back all franchises at whatever cost, negotiate unconditional releases with franchisees and landlords and basically "get out of the business". Thus, in February of 1970 they set the wheels in motion to accomplish this end.

This appears to be a fair analysis of the situation in late February and March 1970.

While the quarterly report was less than candid about plans for SaxonS, Touche Ross had no responsibility for it and no duty to monitor management's public statements in it. Similarly, Touche Ross had no responsibility for the *Kansas City Times* article of March 10, 1970, which reported the letter to shareholders.

8. *The Feibleman Settlement.* On June 1, 1970, Charles Feibleman, an Indianapolis attorney, wrote to Berger on behalf of a number of Indiana residents who had purchased Topsy's securities and claimed violation of the federal securities laws. Feibleman proposed a meeting in Kansas City on June 17, 1970. The meeting was held in Berger's office and Berger, House, Tucker, Lerner, Feibleman, and another attorney in Feibleman's firm attended. No one from Touche Ross was present. Feibleman stated that he represented approximately sixty purchasers and William Fry, an Indianapolis stockbroker. Fry had had numerous discussions with House, Berger, and other Topsy's and SaxonS personnel about SaxonS, beginning January 1969. House's understanding, based on the discussion at the meeting, was that Feibleman's clients were making claims against only himself and Berger. The claims were based on oral statements made in the course of the above discussions with Fry, and also representations in the narrative portion of the prospectus alleged to have been misleading because of material omissions. With respect to the prospectus, the three claims asserted related to the pilot unit's first-year sales of $413,000.00, the number of units open or under construction, and the number of units that were company-owned or operated or were being bought back.

The Feibleman claims were discussed at Topsy's board meetings on July 7 and July 28, 1970. However, the minutes, drafted by Tucker, do not mention the matter. Robert Petsche, the Touche Ross junior partner on Topsy's account, was present at the July 7 meeting; Sharlip was present at the July 28 meeting. A memorandum by Sharlip shows that as of July 22, 1970, Touche Ross understood that the only claim based on the prospectus was the one relating to the statement of first-year sales for the pilot unit. On July 13, 1970, Maurice Guy, then Topsy's controller, had written to Tucker asking Tucker to advise Touche Ross of the nature and current status of the "potential stockholder action discussed in the Board of Directors' meeting on July 7, 1970." He asked Tucker to include enough background to permit Touche Ross' legal counsel to review the matter. Tucker wrote to Touche Ross on September 23, 1970, as follows:

This is in response to your oral inquiry in connection with [the] audit being currently performed for the above-named Company. You have requested an opinion regarding the statement located at page 10 of the Prospectus dated February 4, 1969 issued in behalf of the above-named Company, relating to the SaxonS Sandwich Shoppes unit in Columbus, Ohio, reading as follows: "In its first year of operations, its gross sales were approximately $413,000."

In the opinion of the undersigned, on the basis of information at hand, this statement above quoted does not contain any misrepresentation of a material fact.

A settlement agreement dated July 20, 1970, was entered into between Berger and House and counsel for approximately sixty-four claimants. Berger agreed to pay $168,480.00 and House $39,520.00, as individuals. There is no evidence that any part of the funds came from Topsy's. Counsel agreed to obtain executed releases from all claimants. The releases discharged Berger and House, and

their agents, representatives, and all other persons, firms and corporations whom-

soever, of and from any and all claims or demands, or liability or responsibility for such claims or demands, arising in the period prior to and including the date of the signing of this release, which could now be made or are now possessed by the undersigned or which the undersigned may hereafter have in any way arising out of or in connection with the purchase or sale or holding or ownership of Class A common stock in Topsy's International, Inc., a Delaware corporation, or convertible subordinated debentures of said Topsy's International, Inc., or of any other securities of said corporation, or any matters connected therewith or arising therefrom.

In connection with the settlement, and apparently to satisfy Topsy's management, Feibleman sought an opinion from Louis Loss, a Harvard Professor and author of the leading treatise on securities law, as to whether the settlement need be disclosed to shareholders. Loss indicated that, under the circumstances presented to him, neither the corporation nor the settling officers would be required to file any report of the settlement with the SEC. Similarly, he stated that there was no SEC reporting provision that would require that the shareholders be advised of the settlement. With respect to potential civil liability, apart from SEC reporting requirements, Loss stated that if the corporation or the settling officers were to buy or sell stock and make any statements about the corporation, failure to disclose the settlement might be a material omission. Loss believed, however, that civil liability to buyers for material misstatements such as those that gave rise to the Feibleman claims would "not be aggravated by a mere failure to disclose the settlement." On the other hand, if the corporation or settling officers published additional information about the corporation "of such a nature that the omission to refer to the settlement could be said to make the statements made misleading, then liability might accrue."

With respect to the audit of Topsy's 1970 financial statements, Touche Ross was concerned about the Feibleman claims in that they might indicate that Topsy's had a material contingent liability to other claimants whose claims had not been extinguished. Touche Ross was concerned only about misrepresentations or misleading statements in the prospectus, apparently believing that the company would have no liability for oral misrepresentations made by Berger and House. At that time, Touche Ross believed that the only claim regarding the prospectus related to the $413,000.00 sales figure for the pilot unit. In a memorandum dated July 13, 1970, Sharlip sought advice from Touche Ross' national staff. Sharlip's request for advice referred to a letter by counsel for the selling shareholders to Feibleman, which stated that in counsel's opinion the statement in the prospectus furnished no basis for legal action, and if that had been the only complaint asserted by Feibleman, no settlement would have been offered, either by the company or the selling shareholders.

Touche Ross concluded that no material contingent liability existed for Topsy's, and that disclosure in the audited financials was not required or appropriate. Plaintiffs have not proven that the Touche Ross decision was not in accordance with generally accepted accounting principles or improper in any way.

9. *Quarterly Report to Shareholders, June 24, 1970.* This letter reported that SaxonS was not profitable and that management had concluded that further investment in the development and sale of SaxonS units would be unwise. Topsy's was continuing to repurchase franchises or terminate agreements in order to reduce SaxonS' staff and overhead. Fourteen franchises had been repurchased or cancelled. SaxonS was operating three units in Ohio, but negotiations to sell two of these were in progress. The third shop was being operated by SaxonS for a franchisee on a percentage contract, which was modestly profitable. Five units remained franchised in spite of offers to terminate the agreements and waive payment of continued fees. As long as these remained, management would have to continue supervisory assistance.

Topsy's planned to discontinue SaxonS and to write-down to present value all SaxonS real estate, fixtures, and equipment owned by Topsy's, or for which Topsy's had assumed responsibility. SaxonS' goodwill of $226,000.00 and reduced valuations of real estate, fixtures, and equipment amounting to $1,410,000.00 were charged against income. In addition to these non-recurring losses, Saxons had incurred substantial operating losses in the year-to-date. The figures for the sixteen weeks ended May 9, 1970, showed revenues of $3,006,000.00 but, because of losses in all other categories, a net loss in earnings of $1,882,000.00.

10. *Topsy's 1970 Annual Report.* This report supplemented the explanation of SaxonS' demise that had been given in the quarterly report. Three franchise agreements remained, and all company-owned units had been closed. The Message from Management section noted that the Snack Bar and Popcorn Division was continuing to operate on a profitable basis. Revenues were up $932,432.00 over fiscal 1969. Pre-tax earnings for the Snack Bar and Popcorn Division were $522,748.00 in comparison to $654,406.00 for 1969. Topsy's realized an extraordinary gain from bond repurchases. Income, however, had been offset by SaxonS' losses, resulting in a net loss of $1,984,808.00 for the year. The Message ended on a positive note:

> The Company's cash position is adequate to finance its own growth and at the same time enable Management to be alert to, and investigate other opportunities. This liquid position should afford numerous opportunities to recoup from past problems and Management is confident of the future.

As we indicated above, there was no mention of the Feibleman settlement in the audited financials certified by Touche Ross as a part of the annual report.

## IV. DECISION AND DISPOSITION.

A. *Statute of Limitations.* The plaintiff class consists of purchasers of Topsy's common stock and debentures between September 28, 1968 and March 10, 1970. The latter date marks the end of positive public state-ments about SaxonS. The amended complaint against Touche Ross was filed on October 17, 1973. That complaint did not relate back to the original complaint in the action filed on March 11, 1971. *Graves v. General Insurance Corp.*, 412 F.2d 583, 585–86 (10th Cir. 1969).

In accordance with the federal tolling doctrine as discussed earlier, we must determine whether a reasonable investor in Topsy's should have discovered the alleged fraud in advance of two years prior to filing suit against Touche Ross, *i. e.* before October 17, 1971. The burden of proof with respect to the statute of limitations issue is on plaintiffs. *Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir. 1978); *Hupp v. Gray*, 500 F.2d 993, 996 (7th Cir. 1974).

Plaintiffs claim that the alleged fraud was discovered in the fall of 1971 and could not reasonably have been discovered sooner. Plaintiffs' suggested findings of fact describe the discovery of the alleged fraud as follows:

120. In the latter part of 1971, Farmer contacted Robert C. Gordon at his home and advised him that Berger had misused Topsy's funds for personal matters. Thereafter, Farmer met with Robert C. Gordon and Marvin L. Rich and furnished certain information about SaxonS which was the basis for some of the allegations in this litigation.

121. On or about October 28, 1971, Marvin L. Rich informed one of his clients, Marshall Gordon [a named plaintiff] that certain important facts had just come to his attention of which neither Rich nor Marshall Gordon had been previously aware. Those facts are the ones set forth in the Complaint, which was filed November 11, 1971.

122. A reasonable investor who read all information made available to the public prior to November 11, 1971, could not have discovered the fraudulent scheme described above. (Citations to Farmer deposition, exhibits, and transcript omitted.)

This account is somewhat misleading. It implies that Marvin Rich related to Marshall Gordon facts which Rich learned about from Farmer. Farmer's deposition testimony, however, was that he met with Robert Gordon and Rich in November, after Rich met with Marshall Gordon. We need not resolve this problem, however, because our concern is with when the alleged fraud should have been discovered rather than when it was discovered.

A number of cases have considered events which should have aroused investors' suspicions. We will discuss only those pertinent to the facts here. In *Hupp v. Gray, supra,* plaintiff was induced by misrepresentations to purchase stock in the Variable Life Insurance Company of America (Valic). The purchases were made between May 1, 1965 and January 10, 1966. The misrepresentations included statements indicating that Valic "had a commanding lead over the major insurance companies in the field and that the Chicago Board of Education was about to execute a contract with Valic for the purchase of a group policy covering thousands of teachers." At the time of his last purchase, plaintiff was told that the stock, then selling at $47.00 per share, might go up to $75.00 "at an early date." It, however, began to drop and plaintiff sold, in March 1967, at $17.50 per share. Plaintiff claimed that he discovered the misrepresentation by accident in August 1970. He filed his initial complaint in September 1971.

The court concentrated primarily on the sharp decline in the stock's value and concluded that plaintiff's action was barred by the applicable statute of limitations, reasoning as follows:

> Even a wholly unsophisticated investor should have realized in March 1967—when the market price had fallen to $17.50 rather than rising to $75.00—the existence of facts sufficient to precipitate into his consciousness a geographical paraphrase of the somewhat hackneyed remark of Marcellus to Horatio. The sharp fall in the market price was not a concealed fact but, rather, was clearly and painfully revealed to the plaintiff. "At the very least, these circumstances should have aroused suspicion or curiosity on the part of plaintiff." *Morgan v. Koch, supra,* 419 F.2d [993] at 998 [7th Cir.]. Hupp, moreover, had an opportunity to investigate the representations made to him concerning Valic. The plaintiff sold his Valic stock through a broker-dealer other than Becker and could easily have inquired, at the time of the sale, as to what has happened to Valic. Yet although Hupp had notice that something was amiss and ample opportunity to investigate, he did nothing. *Id.* at 996–97.

In *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402 (2d Cir. 1975), the court noted that the statute of limitations begins to run when a plaintiff should have discovered the general fraudulent scheme rather than when he becomes aware of all aspects of the alleged fraud. It concluded that because of a precipitous decline in the price of the stock in question and other lawsuits against the offending company by the SEC and other parties, plaintiffs should have discovered the fraud earlier than they claimed and were thus barred by the statute of limitations.

The Second Circuit, in *Arneil v. Ramsey,* 550 F.2d 774 (2d Cir. 1977), held that plaintiffs were barred by the Washington three-year statute of limitations. Plaintiffs were investors in Blair & Co. and had been solicited to buy securities in early 1969. In March 1969, Blair published an advertisement claiming that it was in fine financial shape and would be an excellent growth investment. The advertisement mentioned "the importance to the investing community of the new Blair & Co. as we expand . . . with the addition of . . . the well-known San Francisco-based firm of Schwabacher & Co., which now becomes the Western Division of Blair & Co." Five months later, Schwabacher publicly admitted willful securities law violations. In March 1970, a Blair letter to shareholders noted the "absence of any book value" of Blair stock. In August 1970, the New York Stock Exchange announced that Blair had

terminated its public business because of capital problems. In September 1970, an involuntary petition in bankruptcy was filed. The lawsuit was filed in April 1975.

The court noted that the federal tolling doctrine "has application only where the plaintiff has 'exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud,' and '[u]nawareness of facts or law, alone, does not justify suspending the operations of the statute.' *Morgan v. Koch*, 419 F.2d 993, 997 (7th Cir. 1969)." *Arneil, supra* at 781. Because one of the plaintiffs knew, in July 1970, of the "extremely critical nature of Blair's problems" and neither plaintiff took action to learn the facts which would have disclosed the fraud, they were time-barred.

The plaintiffs in *Cook v. Avien, supra*, had been led to believe that Avien had a "rosy" future. They purchased 6% convertible subordinated notes in September 1968. In March 1968, Avien had purchased Davis-Edwards Pharmacal Corporation. In December 1968, Davis-Edwards' ongoing problems were discussed at an Avien shareholders meeting and those present were told that earnings would be "anemic." In February 1969, a six-month interim report was released showing substantial losses. The stock hit a high of 11.1 in January 1969, but declined rather steadily after February. After December 1969, Avien never traded over 4. Plaintiffs did not file their action until March 1971, "[d]espite strong indication as early as December of 1968 that the company was experiencing severe losses." *Id.* at 696. The court analyzed the circumstances as follows:

> As the record makes clear, Avien's serious financial difficulties, in direct conflict with what plaintiffs complain they were led to believe, were unquestionably apparent by the end of 1969 and may have been obvious by March of 1969. The financial data available to the purchasers provided them with sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale of the notes.

> Despite the signs of financial difficulties, the only evidence purchasers presented to show they acted with reasonable diligence to discover any wrongdoing was a sketchy account of a June 2, 1970, meeting between Weiss [president and chief operating officer of Avien] and themselves. The reasonable diligence standard required more. The storm warnings, absent a greater inquiry by the purchasers, were sufficient to initiate the running of the statute of limitations on this cause of action at least as of January 1, 1970.

> To hold otherwise would permit the securities acts to be used as havens for speculation and a buffer against any investment loss. When faced with knowledge of a company's serious financial difficulty, an investor cannot be allowed to wait for market increases knowing that if growth does not take place the securities acts will provide the insurance against loss. Instead, the exercise of reasonable diligence requires an investor to be reasonably cognizant of financial developments relating to his investment, and mandates that early steps be taken to appraise those facts which come to the investor's attention. Although this principle is particularly true when the non-disclosed facts are negligently omitted, even where facts are fraudulently withheld a plaintiff cannot be allowed to ignore the economic status of his or her investment. *Id.* at 697–98.

The court held that the one-year statute of limitations of Section 12(2) of the 1933 Act barred plaintiffs claim but, because the district court had improperly placed the burden of proof on defendants, the issue of the Section 10(b) limitations question was remanded for further determination.

In the instant case, after the public offering on February 4, 1969, Topsy's stock moved rather precipitously downward. Touche Ross argues that the rapid decline in 1969 and 1970 alone was sufficient to arouse the class's suspicions, especially coupled with announcements in late 1969 about the difficulties and ultimately the termination of SaxonS. While the point is well

taken, we do not believe that the severe decline alone was adequate because, as Touche Ross has pointed out, there was a very drastic general decline in the market in 1969 and 1970.

In 1968 and 1969 numerous inconsistent statements about SaxonS were made to the investing public. For example, a newspaper article, in October 1968, quoted Berger as saying that sixty-three franchises had been sold in the prior month, but, in February 1969, the final prospectus stated that ten units were open and operating, ten more were under construction, and twenty other franchises had been sold. The prospectus stated that the proceeds would be used to expand SaxonS, but Topsy's quarterly report of March 19, 1969 indicated that the proceeds would be used to expand all phases of Topsy's business.

During 1968 and 1969 a rosy picture had been painted of SaxonS and its potential. Proceeds from the large debenture sale were to be poured into SaxonS' development. In March 1970, however, Topsy's announced losses in net earnings and a policy of repurchasing SaxonS' franchised units. In June 1970, Topsy's reported more losses and its conclusion that the SaxonS' operation was not profitable and would be discontinued. This rather abrupt shift by Topsy's management should have aroused the suspicions of investors.

In late 1969, Jas. Oliphant & Co., an investment banking firm, reported as follows:

*TOPSY'S INTERNATIONAL (OTC–7)* —reported earnings per share of $0.41 for the year ended July 31, 1969 as compared with $0.47 for the previous year. To say the least, these results were extremely disappointing. On a visit to the company in early June, chairman Jerry Berger, was estimating $0.80 per share and made available divisional breakdowns to substantiate these figures. Although, that was only seven weeks prior to the end of the fiscal year, shortly thereafter, the company revised its forecast indicating that several Saxon's Sandwich Shoppes which had been scheduled to open prior to the year end did not due to construction delays, and thereby decreasing the anticipated franchise fees.

Throughout this period, we were assured that there was a sufficient backlog of signed applications for Saxon's franchises to meet estimates and that financing was no problem, especially with Topsy's heavy cash position at that time. Routine contact with the company in mid-October brought to light that expansion of Saxon's was halted due to the high cost of money; furthermore, there was no change in number of units under construction since June and that leases which we were told to be in negotiation were never consummated. As of July 31, 1969, Topsy's had a cash position of over $4 million which probably would have been used to purchase the land and buildings during this tight period had it been able to obtain an adequate return on investment. This leads us to conclude that the Saxon's Sandwich Shoppes were not as successful as the company has lead us to believe.

Unfortunately, there seems to be an extremely wide credibility gap between Topsy's and the investment community or its management is not too well informed as to current operations. For example the introduction of data processing during fiscal 1969 realized an additional expense of $100,000, which was said to have been unknown until after the year had ended.

Earnings for the first quarter of the current fiscal year was reported at $0.23 per share versus $0.18. Analysis of these results shows a non-recurring gain of $0.05 which was not recorded as such in the release. Our tentative earnings estimate for the current fiscal year is $0.40–$0.50 per share.

We find it hard to take seriously any of management's plans until we can see a definite sign of accomplishment. Consequently, until that time, we prefer to avoid the issue.

Obviously, Oliphant's suspicions were aroused by discrepancies between manage-

ment's publicly announced plans and forecasts for SaxonS and its publicly announced results.

The Feibleman investors apparently became suspicious in the spring of 1970. While their claims primarily related to oral misrepresentations, public statements were also questioned. Fry was concerned enough about the price behavior of the stock to make numerous inquiries of Topsy's management in 1969.

Finally, two class members testified as to when their suspicions were actually aroused. Marshall Gordon contacted his attorney, in June 1969, regarding the causes for the decline in Topsy's stock. In 1970, Mark Anthony suspected "stock manipulation" and conferred with his attorney about further investigation. The fact that he may not have suspected misrepresentations is not significant.

All of these activities and events lead us to the conclusion that investors should have become suspicious, or at least highly curious, by June 1970 at the latest, when Topsy's publicly announced SaxonS' failure. At that point, it was incumbent upon investors to investigate in the exercise of due diligence. The statute of limitations gave them two years, but they made no effort to bring Touche Ross into the case until 1973. Although we believe there may be instances in which the involvement of a peripheral party does not and could not come to light until pretrial discovery, that is not the situation here. In attempting to prove Touche Ross' liability, plaintiffs relied heavily on a theory that note (11) of the certified financial statements in the prospectus incorporated the SaxonS' section by reference. The statute is not tolled while plaintiffs develop legal theories from facts already known. Furthermore Anthony testified that, in 1968, he "presumed" that Touche Ross had investigated the entire prospectus and not merely the audited financials. He also testified that it was important in his decision to purchase Topsy's securities "that a national accounting firm was one of the experts." From all these factors, we conclude that plaintiffs' claim against Touche Ross is time-barred by the two-year statute.

**B.** *The Merits.* Although our holding with respect to the statute of limitations effectively disposes of this action, we have considered the merits and have concluded that, there too, judgment must be in Touche Ross' favor.

The acquisition and attempted development of SaxonS by means of the subsequent public offering of stock and debentures were Berger's ideas. His motivation for the purchase of SaxonS was twofold. He knew that Topsy's earlier announcement that it was going into the franchise field had improved the performance of Topsy's stock. He had done well in the 1967 offering and believed he could do as well or better in an offering based on a new franchise operation. He also believed that, if SaxonS were successful as a Topsy's subsidiary, Topsy's long-term financial stature would blossom. He realized that even if SaxonS did not work out, Topsy's would not suffer greatly because of its other operations which were rather stable. The decision to purchase SaxonS was independent of anything Berger learned from Sharlip. It is possible that had Sharlip found serious problems in the SaxonS' financial records, Topsy's might have pulled out. It is clear, however, that Berger was not all that concerned with details of SaxonS' financial condition at that time.

When the acquisition occurred, Berger was well aware of West's limitations and began immediately to seek a new head of operations for SaxonS. His statement to Topsy's board of directors that SaxonS was well managed is an example of Berger's less than candid approach. The same is true of his statement to Schifman that West would continue as head of SaxonS. Berger contemplated West's staying with the company only until a better manager could be found.

Public statements by Topsy's management, in early fall 1968, show consistent carelessness, even to the point of recklessness in several instances. The number of units open or under construction was frequently overstated. The overstatements, however, were usually so slight that they

cannot be said to be materially misleading. Occasionally, however, the overstatements were extreme enough to be considered material. This is true of the reports that twenty-nine units were under construction and that fifty units were expected to be in operation by the end of 1969. Similarly, Berger's statement, in October 1968, to Schifman that sixty-three franchises had been sold in the last month was a material misrepresentation.

Earlier in the opinion we analyzed the statements individually about SaxonS in the final prospectus. Considering them separately, we concluded that, except for the Use of Proceeds section, they did not contain material misrepresentations or omit facts necessary to make what was said not misleading. We believe that this may be a case where the whole may be greater than the sum of its parts, that is, while individual items may be substantially accurate, the SaxonS' material *in toto* might be said to be misleading. The picture of SaxonS painted by the prospectus and pre-prospectus public statements is entirely positive, yet Topsy's management was aware of operational problems, franchise fee refunds, and a decline in sales for virtually all units. We are completely satisfied, however, with our conclusion that Touche Ross cannot be held responsible for these statements about SaxonS. With respect to the Use of Proceeds section, we believe that plaintiffs have not proven that Touche Ross was aware of Berger's intention to use the proceeds otherwise or, that by presenting management's case to the SEC, Touche Ross was assisting in the fraud being perpetuated by Topsy's management.

In the period after the offering, Topsy's management continued its practice of painting a rosy picture of SaxonS' operations. Berger, with Tucker's assistance, misrepresented earnings by $150,000.00 in the quarterly report of June 20, 1969. At year end, Topsy's management was contriving to bolster earnings so that the annual report would appear as positive as possible. Touche Ross was aware of some of this and refused to include the Poulos transactions in reported earnings for fiscal 1969.

Touche Ross did, of course, permit the good will intangible to be continued and did permit the Gottlieb transaction to be credited to fiscal 1969. In both cases Touche Ross acted in accordance with generally accepted accounting principles. We are satisfied that plaintiffs have not proven that Touche Ross knew that by doing so they might be assisting in a fraud.

The Feibleman settlement came after the announcement of SaxonS' losses and outside the class period. It is relevant, therefore, only to the statute of limitations issue and, possibly, to the state of mind or intent of the parties during the liability period. We do not believe that Touche Ross' agreement with Topsy's that the settlement did not have to be disclosed shows that Touche Ross was aware all along that it was substantially assisting in fraudulent conduct.

In summary, we conclude that while plaintiffs have shown that there were securities laws violations, they have not proven that Touche Ross knew of the violations and of its possible implication in the scheme or that Touche Ross knowingly aided and assisted substantially in the violations.

Although our decision, in so far as it is based on the merits, might well go no further, we wish to comment briefly on two other issues. As we indicated in our discussion of the law pertaining to plaintiffs' claims, reliance was presumed and Touche Ross was given an opportunity to rebut the presumption. With respect to the class as a whole, Touche Ross attempted to do this by testimony from market experts to the effect that investors during the period in question did not rely on company-specific facts, but only on the fact that a company was in the franchising field. Franchise stocks were booming and "reasonable" investors were scrambling to get in on the boom. While the testimony was impressive, we would be extremely reluctant to rest the outcome of this case on it alone. In effect it showed that investors during the period were in fact "unreasonable." Were we to base our exoneration of Touche Ross on this evidence rebutting reliance, we are inclined

to believe that a severe blow would be dealt to that part of the federal securities regulations which depend upon private causes of action to insure compliance.

■ With regard to individual class members, Touche Ross attempted to rebut reliance by the testimony of individual class members that they did not rely on specific public statements, and by individual affidavits to that same effect. Had we found in plaintiffs' favor, we would have disallowed the claims of those class members who testified as to their non-reliance insofar as their cross-examination did not rehabilitate their claims. We would probably, however, have disregarded the non-reliance shown by the affidavits submitted by Touche Ross. The affidavits of individual class members were prepared by Touche Ross, were not subject to cross examination, and were not admissible into evidence.

We also indicated that there was a rebuttable presumption in plaintiffs' favor that a loss shown by a decline in market price of the stock was attributable to the fraud, if fraud was proven. Touche Ross attempted to rebut the presumption by means of an expert who testified at length about market behavior during the relevant time period and concluded that the behavior of Topsy's stock was typical of the behavior of the stock of other similar companies that were presumably untainted by fraudulent conduct. It was his opinion that the entire decline in Topsy's stock was attributable to the following: the decline of the market in general during the 1969–1970 period, the decline of fast food franchise restaurants stocks, and, in particular, the decline in the prices of those stocks of companies within the industry which had financial characteristics and financial experiences similar to those of Topsy's.

In rebuttal of Touche Ross' expert, plaintiffs' expert testified that in his opinion general market factors accounted for about 22% of the decline and that the remainder was attributable to industry-related and company-specific factors. He could, however, attribute no portion of the decline to the allegedly fraudulent acts.

We believe that Touche Ross' expert adequately rebutted the presumption in plaintiffs' favor. It was then incumbent upon plaintiffs to show what portion, if any, of the losses suffered by purchasers was attributable to the alleged fraud. As we indicated, plaintiffs' expert was unable to do so.

C. *The Cross-Claims.* Because we have found in favor of defendant Touche Ross, we need not consider the cross-claims for contribution against Touche Ross by Topsy's, Berger, House and Nuell, the underwriters, and Tucker Charno, or the cross-claims by Touche Ross against those parties.

1. *Topsy's Cross-Claim for Indemnity Against Touche Ross.* Topsy's, Berger, House, and Nuell filed cross-claims for indemnity against Touche Ross seeking to recover the amount paid out in settlement and attorneys' fees. Topsy's argues that Touche Ross had breached its fiduciary duties which arose out of its relationship with Topsy's. The cross-claims are apparently based on the theory that an indemnification requirement is implied by law in such circumstances, or that the relationship embodied a contract for indemnification.

■ Plaintiffs' claims, which Topsy's, Berger, House, and Nuell settled, were for fraud; the attorneys' fees expended were in defense of allegations of fraud. The antifraud provisions of the 1934 Act, which served as the basis of plaintiffs claims against these defendants, require misconduct more serious than negligence, that is, recklessness or willful misconduct. "It is well established that one cannot insure himself against his own reckless, wilful or criminal misconduct." *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1288 (2d Cir. 1969), *cert. denied* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). In the context of securities laws violations, an indemnification agreement would be unenforceable. *Premier Corp. v. Economic Research Analysts, Inc.,* 578 F.2d 551, 555 (4th Cir. 1978); *Globus, supra; deHaas v. Empire Petroleum Co.,* 286 F.Supp. 809, 815 (D.Colo.1968), *aff'd in part, vacated in part on other grounds,* 435 F.2d 1223 (10th Cir.

1970). Furthermore, in light of the facts as we have found them, Touche Ross cannot be said to have violated any duties owed to Topsy's, Berger, House, and Nuell.

█ 2. *G. Kenneth Baum's Claim Against Topsy's.* Baum, an outside director of Topsy's and control person of George K. Baum and Co., a brokerage firm which allegedly was a market-maker in Topsy's stock, was never a defendant in this lawsuit. He was a third-party defendant by virtue of third-party complaints filed against him by the underwriters and Tucker Charno. Because of settlements, the third-party complaint of the underwriters against Baum was dismissed with prejudice by order of the court on April 4, 1979, and the third-party complaint of Tucker Charno was similarly dismissed on May 2, 1979. On May 8, 1979, Baum filed a cross-claim against Topsy's alleging that Topsy's by-laws require that Topsy's advance, indemnify, and hold him harmless for all payments and expenses, including attorneys' fees, settlement payments, costs, and any other payments incurred by Baum in his defense of the claims against him in this litigation.

Federal Rule of Civil Procedure 13(g) provides for cross-claims against *co-parties*. Because orders dismissing Baum were entered on April 4 and May 2, 1979, Baum was not a party when he filed his purported cross-claim. It will, therefore, be dismissed.

## V. *FINALE.*

During the trial, defendant Touche Ross objected on hearsay grounds to a number of exhibits as well as testimony offered by plaintiffs under a conspiracy theory. In accordance with the procedures employed in criminal conspiracy cases, the evidence was conditionally admitted. *See, e. g. United States v. Andrews*, 585 F.2d 961 (1978). In view of the outcome of the case, we need not dwell on the admissibility of such evidence. We have, however, considered it in reaching our decision and, therefore, it is deemed admitted. All other evidence to which objection was made and a ruling deferred has been fully admitted unless otherwise noted in the opinion.

This Memorandum and Order shall constitute the court's findings of fact and conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure. Judgment is rendered for defendant Touche Ross and against plaintiffs. The cross-claim of G. Kenneth Baum is dismissed, and all other cross-claims are also dismissed. Defendant Touche Ross shall prepare, circulate and forward to the court for its approval a Journal Entry of Judgment reflecting the decision herein.

IT IS SO ORDERED.